BOGGIANNA *v.* ANDERSON.

Opinion delivered April 16, 1906.

DEED—UNDUE INFLUENCE.—To avoid a deed for undue influence, it is not sufficient that the grantor was influenced by the grantee in the ordinary affairs of life, or that he was in close touch and upon confidential terms with him; but there must be a malign influence resulting from fear, coercion, or other cause which deprives the grantor of his free agency in disposing of his property.

Appeal from Lee Chancery Court; *Edward D. Robertson,* Chancellor; affirmed.

*P. D. McCulloch,* for appellants.

The undisputed facts, Raggio's age, his weakened physical and mental condition, defendant's daily and constant intimate attendance upon and association with him, and her supervision over him and every detail of his business affairs, remove the *prima facie* presumption that the deed was his voluntary act, free from undue influence, and impose upon her the burden of establishing the legal integrity of the conveyance. 29 Am. & Eng. Enc. Law, 120, 121 and cases cited; 67 Ala. 368; 62 Ala. 347; 3 Baxter (Tenn.), 283; 4 *Ib.* 41; 63 N. J. Eq. 245; 201 Ill. 70; 92 Cal. 632; 32 Minn. 25; 141 Mo. 466; 56 S. W. 512; 8 Humph. (Tenn.), 145; 1 Cold. 290.

Extreme weakness will raise an almost necessary presumption of imposition, even when it stops short of legal incapacity. 2 Mason, 378. It is not necessary, in order to secure the aid of equity, to prove that the deceased was at the time insane, or in such a state of mental imbecility as to render him entirely incapable of executing a valid deed. It is sufficient to show that, from sickness and infirmities, he was at the time in a condition of great mental weakness, and that there was gross inadequacy of consideration. From these circumstances imposition or undue influence will be inferred. 94 U. S. 506; 11 Wheat. 125; 2 Pom. Eq. § 947; 15 Ark. 555.

*W. A. Compton,* for appellee.

The mental capacity of Raggio to execute the deed is established, and hence the chancellor's finding to that effect, and his decree dismissing the complaint for want of equity, should stand. The evidence discloses no undue influence exerted by the appellee, and none will be presumed. Absolute soundness of mind is not necessary to enable one to make a valid conveyance. It is sufficient if the grantor fully comprehended the import of the particular act. 4 Ind. 443; 36 Ill. 109; 44 N. H. 541; 55 Me. 256; 4 Bush, 239. To avoid the conveyance, the undue influence exerted, if any, must be such as to destroy the free agency of the party. 4 Metc. (N. Y.), 163; 27 Am. & Eng. Enc. Law, 497, note 2; 77 Ill. 397; 49 Ark. 371. Old age, physical infirmities

and even partial eclipse of the mind will not prevent making a valid conveyance. 29 Ark. 159; 49 Ark., *supra.*

HILL, C. J. Dominic Raggio left his native village of Borzonasca, Italy, in 1851, and came to the United States. He served as a soldier in the civil war, and not a great while after the close of the war he settled in Lee County, Arkansas, where he resided until his death on the 8th of January, 1901, at the age of 78 years. He was of more than average intelligence, and through industry and frugality gathered an estate yielding an income of about $1,600 per annum, estimated to be worth from $12,000 to $15,000. His estate consisted of 371 acres of land, of which 160 or 170 were in cultivation, and upon it was situated the village of Raggio, the rents therefrom amounting to about $800 per annum; and he had a home nearby the village on the same tract. He had a friend in Memphis named Nick Malatesta, and he had a warm friendship for him and for his (Malatesta's) family. A few years before his death a young Italian named Bruno represented himself as his nephew, and Raggio accepted him as such for a time, but later learned he was an imposter. Raggio at some time in his life had a wife and child, and they were buried in a Catholic cemetery in Memphis, but the exact location of their graves was unknown to him, and he had requested Miss Malatesta to see that he was buried in this country, as he wanted his body to lie near his loved ones. For the last five or six years of his life Raggio was grievously.afflicted with a cancer, which gradually extended its ravages from lip to eye, exposing the teeth and nearly destroying the vision. Death came, however, not from this encroaching disease, but from pneumonia, and he was confined to his bed only a few days, in his last sickness. Up to this sickness he was more or less active and healthy, according to varying views; remarkably so, considering his age and affliction. Over five years before his death, the appellee, Mrs. Anderson, was employed as housekeeper, cook and nurse for Mr. Raggio. She did all the cooking and household work, bathed and dressed his sores, and attended to his business affairs in a limited way under his directions. He never learned to speak English fluently, and it was always difficult to understand his broken speech, and this difficulty greatly increased as the disease destroyed lip and nostrils. Mrs. Anderson was

constantly called upon to interpret his conversations. Mrs.
Anderson's moral character, before going to Raggio's, was a sub-
ject of neighborhood gossip. She was once divorced and thrice
married. But her character, be it good or bad, is not an issue
in this case. There is not even an insinuation that her relations
with Raggio were meretricious. The evidence from all sides
establishes without doubt that she faithfully ministered unto the
manifold necessities and afflictions of this aged man. That he
became attached to her and dependent upon her services is natu-
ral and evident, for she was the only person who stayed with
him and cared for him when he became an object of horror and
repulsion. His condition was hardly less pitiable than the lepers
of Judea, driven without the gates of the cities and compelled
to cry out "Unclean! Unclean!" whenever a fellow being
approached.

In 1890 Raggio made a will, in which he appointed his friend,
Nick Malatesta, executor and trustee, and gave him 25 per cent.
of his estate for his compensation as such executor and trustee.
The estate was to be sold by the executor, and the residue "dis-
tributed among my nephews and nieces in the Kingdom of Italy
that may be living at my death, *per capita.*" In 1893 he added
a codicil, providing that, in case his nephews and nieces did not
claim their respective shares within two years from his death, all
of the estate should go to Nick Malatesta. In 1895 Nick Mala-
testa died, and in 1897 Raggio added another codicil to the will,
reciting his friend's death and substituting his eldest daughter,
Miss Rosa Malatesta, to the office and compensation of her father;
and providing, in case the nieces and nephews failed to appear
in two years, that the heirs at law of Nick Malatesta (naming
them) should succeed to the estate. Nearly a year after this he
executed a power of attorney to Miss Malatesta, authorizing her
to manage and control all of his property for him. She attended
to various matters for him, but does not appear to have acted
under this sweeping power given her. He made a later will,
and Miss Malatesta destroyed it as she did not regard him as
mentally capable. There is some confusion as to its contents,
but it was principally in favor of Miss Malatesta, and provision
was also made for Mrs. Anderson.

When the psuedo nephew imposed upon him, he made a

will in his favor, and provided for Mrs. Anderson having the home place and $15 per month for life, and more in case of disability. After the discovery of Bruno's imposture, Raggio destroyed this will; and about five months before his death made a deed, conveying all the property to Mrs. Anderson. The deed was delivered and recorded. Raggio stipulated that she was not to act under it until his death. This suit is by his heirs at law to set aside this deed on the grounds of undue influence and mental incapacity. The chancellor decided against them, and they have appealed.

Much testimony was introduced by each side to sustain their respective contentions.

That Mrs. Anderson was in a position to influence Raggio is apparent, and her conduct should be subjected to the closest and most jealous scrutiny. It is not sufficient that the grantor or testator was influenced by the beneficiary in the ordinary affairs of life, or that he was in close touch and upon confidential terms with him; but there must be a malign influence resulting from fear, coercion, or any other cause which deprives the grantor or testator of his free agency in disposing of his property. *McCulloch* v. *Campbell,* 49 Ark. 367.

The application of the law announced in the foregoing case to the facts at bar eliminates the question of undue influence. The most serious question is the one of mental capacity, and witnesses of the highest character are in hopeless conflict in their opinions on this question. A distinguished lawyer of Memphis declined to write his will six months before Raggio's death, and one month later a prominent lawyer of Eastern Arkansas wrote the deed in question. Each interviewed and studied the man; one was convinced of his capacity, the other of his incapacity, and this illustrates the conflict in the testimony. Near the same time, a Catholic priest, noted for learning and intelligence, spent a day and night with him; the object of the visit was to present him the rites of his church if he was able to receive them. The rules of the church required the communicant to have an appreciation and understanding of the sacrament before receiving it. The priest, after deliberation, decided that Raggio was capable, and administered the sacrament to him. That his mentality was weakened by age, disease and excessive drink is unquestionably

true; but whether his mind was so weakened that he did not understand and appreciate the force and effect of his deed is the question. It seems to the court that the weight of the evidence sustains his capacity to execute this instrument, and that he did it freely and understandingly. Certainly, it can not be said that the weight of the evidence is against the chancellor's finding; and this kind of conflict is one where the chancellor's finding has persuasive authority, and is entitled to weight and consideration. Raggio's broken speech, increased by his affliction, would render difficult the determination of his mental status, and hence this conflict of opinions can be explained more readily than some other conflicts in evidence.

This disposition of his property was the natural one for him to make. In his prior dispositions of his property Mrs. Anderson received liberal consideration, which clearly showed his intention to provide for her was a fixed determination of long standing. In fact, Miss Malatesta once wrote him, advising him to leave his property to her, rather than to a stranger, evidently referring to Bruno. Miss Malatesta says that he always expressed himself as wanting to leave his property to his relatives, yet the various dispositions he made showed a tendency to favor his friends, the Malatestas and later Mrs. Anderson, rather than his relatives; as each disposition gave less to them and more to his friends. A half century had elapsed since he had seen his kindred, and evidently he knew little of them, and they of him. The depositions of several of his early friends were taken to prove the relationship, and none of these intimate friends of his family knew he had ever been married; and he makes provision in his will and codicils for his nephews and nieces, and yet this suit discloses that he had a sister living, and he evidently did not know it. The kindness of his attendant was ever present to him, and the ties of blood, weakened by fifty years' absence, were easily loosened, and naturally the change came, and in this change the court fails to find any malign and sinister influence producing it, and finds Raggio had sufficient intellect to make the deed, and made it understandingly, and accordingly the decree is affirmed.

WOOD, J., dissents.

McCULLOCH, J., disqualified and nonparticipating.