SCOTT *v.* DODSON, EXECUTOR.

4-8599                                    214 S. W. 2d 357

Opinion delivered November 1, 1948.

*J. H. Carmichael, Jr., J. H. Carmichael, Sr.* and *John E. Coates, Jr.,* for appellant.

*Wootton, Land & Matthews* and *Scott Wood,* for appellee.

GRIFFIN SMITH, Chief Justice. We are asked to say that a writing, executed in testamentary manner and with appropriate formality, was not the will of Mrs. Rita G. Boykin. This would contradict a Probate Court judgment that mental capacity was not lacking when the document was executed.

Appellants—Mrs. Boykin's first cousins by the whole blood—insist it was unnatural for the testatrix to go beyond that line of relationship and favor second cousins by the half blood, and they point to irrational acts and demeanor extending over a long period, and to the fact that between 1892 and 1894 she had "spells" and was under the care of physicians and nurses.

The will was prepared for Mrs. Boykin by the late Hartley Wootton of Hot Springs, where the testatrix resided. Mr. Wootton was one of the State's best lawyers and a man of unimpeachable integrity. Following Mrs. Boykin's death in December 1946, Frank K. Scott and thirteen other plaintiffs—one as guardian for an incompetent minor—filed the suit resulting in this appeal. If successful the estate would be apportioned under the law of descent and distribution, to the detriment of Eliza V., Alice, and Ada Boykin, and Scota Boykin Clayton, all of whom were named in Item 7 of the will and identified in Item 8 as residuary beneficiaries; subject, however, to the provisions made for Evelyn Garnett, a brother who would take if Mrs. Boykin predeceased him. Evelyn [Sidney] died in January 1943.

The income from valuable properties in Washington, D. C.,—mentioned in oral argument as being worth half a million dollars or more—was subject to the will of Mrs. Boykin's mother, construction of which is not before us. Hot Springs property, dircetly affected by our determination of the controversy at hand, is said to approximate $180,000.

The briefs filed on behalf of each group of litigants, which reflect painstaking investigation and distinctive legal skill, simplify the controversy by stipulating matters of record, family relationships, and things explanatory.

As Rita Garnett, Mrs. Boykin was born during the first year of the Civil War. Her father, Dr. A. S. Garnett, enlisted in the Confederate cause, and as a young surgeon saw service on the rechristened frigate Virginia, formerly the Merrimac. Alice Evelyn, Dr. Garnett's wife, for a short period after hostilities ended, was unable to locate her husband. She thereupon went to Selma, Alabama, accompanied by Rita and a son, William. There she was received by a sister, Eliza Scott Boykin, and Eliza's husband, James. They are grandparents of the four beneficiaries whose rights are challenged.

Dr. Garnett, upon ascertaining that his wife and family were at Selma, joined them there for a while. One of appellants' witnesses testified that the Doctor became a professor in the University of Alabama. During the early '70's he moved with his wife and three children to Hot Springs, where for many years he was a leading physician and surgeon.

In support of their contention that the testatrix acted in response to natural instincts when she disregarded relatives whose blood ties were near and selected as beneficiaries those who are spoken of as the Boykin sisters, appellees point to the conduct of Eliza Scott Boykin and her husband in receiving Mrs. Garnett and those dependent upon her during a period of stress and impoverishment throughout the South. They emphasize that ties of personal friendship were superimposed upon blood connections, that for many years the utmost amity and good will prevailed; and, finally, that in consequence of mutual affections, Rita Garnett married Tom Boykin —a son of her Aunt Eliza and Uncle James. This occurred in 1900 when Rita was about forty years of age. Shortly after Tom's death (he lived but ten months after the wedding) Rita gave birth to a son, who was named Aubrey. His mind did not fully develop, and he died in 1922. Appellees are daughters of Burrell Boykin, and Burrell was Tom's brother.

When Rita's mother, Alice Evelyn Garnett, died in February 1922, her three children were William Gar-

nett, Evelyn Sidney Garnett, and Rita G. Boykin. The two sons—brothers of Rita by the whole blood—predeceased her, each having died without issue.

*First—Testamentary Capacity.*—One of the early cases discussing mental capacity to execute a will was written by Judge David Walker. See *Tobin* v. *Jenkins,* (1874) 29 Ark. 151. In *Taylor* v. *McClintock,* 87 Ark. 243, 112 S. W. 405, it was said that if the testator shall have capacity to retain in memory, without prompting, the extent and condition of his property, to comprehend to whom he is giving it, and to appreciate the deserts and relations to him of others whom he excludes from participation in the estate, the document will stand a legal test. A number of our holdings were cited by Mr. Justice BUTLER in *Puryear* v. *Puryear,* 192 Ark. 692, 94 S. W. 2d 695. Another case in point is *Pernot* v. *King,* 194 Ark. 896, 110 S. W. 2d 539.

The will, *prima facie,* reflects rationality. After directing the payment of debts, (the last item named J. Walter Dodson as executor) specific bequests are made in Items 2, 3, 4, 5, and 6—the largest being for $1,500. Item 7 gives ''unto my cousins'' (as tenants in common, naming the four sisters) ''all of the real estate now owned by me in the City of Hot Springs, together with the furnishings therein''. If either of the four beneficiaries should predecease the testatrix, dying without issue surviving, the part apportionable to her would go to the survivor or survivors then living, ''but if either shall then be dead leaving issue living at my death, then such issue shall take the share which their parent would have taken, if living''. There was a further bequest of ''Any and all cash which is owned by me at the time of my death''.

Item 8 leaves the remainder of the estate '' . . . unto my brother, Evelyn Garnett, absolutely and in fee simple, provided he is living at the time of my death; and in the event I am not survived . . . by Evelyn, then I give, devise, and bequeath all of the rest and residue of my property to my cousins [the four sisters],

and their survivors and issue in the manner as provided in the preceding paragraph''.

*Second—Plaintiffs' Evidence*—In spite of testimony that for many years prior to 1938 Mrs. Boykin had at all times been rational and did not disclose any traces of abnormal conduct—testimony, in some instances, given by witnesses who had no interest in outcome of the litigation,—we think appellants have shown by a preponderance of the evidence that shortly after her marriage, and perhaps during the early childhood of Aubrey, there was deportment from which an inference of irrationality might be drawn.

Mrs. Georgia Lea knew the testatrix, but not intimately. She thought Mrs. Boykin was ''violently crazy'' in 1892, 1893, and 1894—''absolutely out of her head, and under the care of three nurses''. There was ''something'' in Mrs. Boykin's attitude denoting abnormality: ''her eyes showed it, and she did strange things all the time. At night she would have queer spells and 'holler', so we got afraid to have her in the house''. When Mrs. Boykin's son died she was in Mrs. Lea's home. The death message so distressed Mrs. Boykin that she didn't comprehend what had occurred:—''said [Aubrey] was sick, but was going to get well,'' and she wanted to go to him. However, after this occurrence Mrs. Lea permitted her daughter, Wilhelmina, to make a trip with Mrs. Boykin, and Mrs. Boykin said something about being ''a crazy baby.''

There were times, said Mrs. Lea, when Mrs. Boykin did not know her. The witness could not definitely fix these dates. Adding obvious hearsay to her testimony, Mrs. Lea asserted Mrs. Garnett had told her Rita was crazy, and that ''everyone thought so''.

Mrs. Lea further testified that she had seen Mrs. Boykin ''run away'' from her brothers, William and Evelyn; that William finally admitted his inability to deal with her and ''gave up,'' but that Evelyn ''was trying; said Rita was his sister, and that he would have to look after her, no matter if she does run''.

Wilhelmina Lea testified regarding the trip she made with Mrs. Boykin—presumably the one mentioned by her mother. On the train en route to Mississippi, and after registering at a Biloxi hotel, Mrs. Boykin acted "queerly". In the parlor car she would talk to herself, grin at people and make them nervous, and in other respects disclose evidences of irrationality. At the hotel they occupied two rooms, with connecting bath. If the witness talked to any of the guests Mrs. Boykin would interfere, with the remark that "they are not fit for me to associate with". Nothing suited Mrs. Boykin. She would sit on the beach for hours at a time. The condition was more noticeable at night, when the distraught woman would turn on the shower bath, "and laugh and talk and knock on the door between us. I'd tell her to go to sleep, but she spent most of the night like that, carrying on. People in the hotel thought we were having a grand time. All day she would disappear, and I couldn't locate her. The men who helped found Mrs. Boykin "back bay where rum-runners hang out". [They were at the hotel "three or four days"].

When asked whether Mrs. Boykin suffered from delusions, Wilhelmina replied, "oh, she did! One time I was in her house when she had a very pretty rug. She took up the idea there was a border had snakes in it, and she was going to get rid of it. [At other times] she'd meet somebody on the street that didn't suit her, [so] she would walk in the center of the street—said they would contaminate her. Regarding snakes on the rug, she said she couldn't stand them crawling around on the border, so she got rid of it. When Mrs. Garnett moved she left a deer's head that had belonged to the Doctor. Rita took the notion the eyes of the deer were following her around the room, so she gave it away. . . . She used to go to the funniest restaurants. She'd have a knife, fork, and spoon in a roll, [and when asked for an explanation] she would say, ' . . . that restaurant is a dirty place, but they cook good food and I am going to it'; so she would take [her own] knife and fork. . . . All her life she was making a will. She would fall out with people and change her will. Even during

her father's lifetime she wanted him to draw a will for her, but he wouldn't do it".

On cross-examination Wilhelmina testified that, to the best of her recollection, the trip to Biloxi was made two or three years after Aubrey's death; but (direct examination), "Mrs. Boykin had an idea her brother William had killed Aubrey".

A great deal of testimony was directed to the proposition that for many years Mrs. Boykin did not understand the nature of business transactions, and in effect that it was a mistake to have allowed her to act without a guardian.

John Collins, of Little Rock, now with the Rightsell-Collins-Barry-Donham Company, had served as trust officer for a Little Rock bank, and as such his business dealings with Mrs. Boykin were extensive. Mrs. Boykin was one of the three beneficiaries under the will of Alice Evelyn Garnett. A statement by Collins was that "each party" desired that administration of the Garnett estate remain open, hence final settlement in Garland Probate Court was delayed. Money arising from the Washington (D. C.) properties and from securities held by American Trust were apportionable a third to each of Mrs. Garnett's children. As to Rita Boykin, a check was sent the first of each month for designated sums, and at year's end any balance due her was forwarded. In "each instance [Mrs. Boykin] usually indorsed and deposited the check".

When William Garnett died in March 1938 a special report was made and Mrs. Boykin's third was paid to her; then, said Collins, "it was intended to be divided half and half by the will". After William Garnett died an effort was, made to convince Mrs. Boykin that she should allow William's widow to receive an apportionment of $40 a month—a sum Mrs. Rita Boykin would additionally receive in consequence of William's death—but Rita would not agree to the proposal. In substance, Collins testified that Mrs. Rita Boykin "didn't know about her property to a certain extent. She understood

checks were due her the first of each month, but would not know how much".

Collins always deposited "the money out of Washington", but Mrs. Boykin thought she didn't have the right to use it—this "for some reason which I always called a 'fixation' that she thought her mother's will prevented her from using it. She thought she had to live on the eighty-five or ninety dollars a month for her personal living expenses. For instance, she wanted a radio and [thought] she couldn't afford it. . . . Later on she didn't know what stocks she owned 'in each one', and when we were getting information for income tax returns . . . she had the idea that first one bank and then the other wouldn't let her have her money, or that they had used it up: taken it. . . . All through the years I kept in touch with Mr. Dodson and Hartley Wootton. . . . Mrs. Boykin made a miscount on a substantial sum of money: told me she had $7,200 which worked out about $13,000, or thereabout, that I deposited".

Letters from Mrs. Boykin to Mr. Collins, and from Mrs. Boykin to Mr. Wootton, were introduced. In a communication from Wootton to Collins the attorney spoke of a certain transaction as "another one of Mrs. Boykin's hallucinations". On several occasions Mrs. Boykin emphasized her points, using the word "strenuously", but spelling it "strenously".

Hypothetical questions were asked of two experts on mental diseases, each of whom, (assuming accuracy of all testimony mentioned in the questions as having been introduced) concluded that Mrs. Boykin was without testamentary capacity. Other witnesses supported those whose testimony has been outlined, while still others mentioned different conduct which, in their opinions, indicated incapacity.

*Third—Testimony for Appellees.*—On cross-examination Mrs. Lea declined to give her age, replying, "That is my business and I don't intend to tell". This was immaterial, but the retort, and answers to other questions in respect of which irritation was shown, is

pointed to by appellees as disclosing an attitude of hostility. When asked whether she thought the testatrix realized "to whom she was making these legacies," Mrs. Lea replied: "I don't know she did, and I don't know when she made this will, or her condition when making the will". On re-direct examination the witness summed up some of her testimony regarding the progressive nature of Mrs. Boykin's malady by saying that she "wasn't violently sick, like at the two spells; just was not smart and she did funny things".

F. M. Boykin, a grandson of James Boykin, testified that as a member of that family he had known the four appellees since childhood. During his early years he spent a great deal of time with relatives connected through his grandfather Boykin's branch of the family, and was impressed with the feeling of gratitude disclosed by Mrs. Garnett, an appreciation of kindness shown during the period of distress at war's end. Inferentially, it was his thought that Rita—Mrs. Garnett's daughter—entertained the same sentiments, and when the immediate members of her own family other than Evelyn Sidney had passed, the idea of repayment occurred to Rita, resulting in the will. Letters introduced in evidence, disclosing normal authorship, tended to support appellees' insistence that even if it should be admitted certain disconnected acts—a number of which occurred several years after the will was executed—hint at temporary delusions, it could not be doubted that Mrs. Boykin had normal periods, during which her decision to favor the second cousins was formed and executed.

It is in evidence that Mrs. Boykin supplied written information from which income tax returns were made; that she was in frequent communication with Mr. Wootton regarding business; that she discussed with him the value of stocks and bonds, and that her investments were usually of the best. Acts of charity are pointed to, with rational implications. There was no disposition to be extravagant, or to spend money for worthless things. Tradesmen testified that her appearance was that of a self-possessed woman, that she bought and paid for the ordinary necessities just as any person would do, and

that it did not occur to them that her sanity was to be questioned. Two physicians (not alienists or psychiatrists) testified regarding Mrs. Boykin's mental condition, and thought it to be normal. Dr. Z. N. Shorts had treated her over a period of 25 years, at the patient's home and in his office. She discussed the nature of minor ailments, indicated what she wanted, and at times discussed investments. On one occasion, while glancing at a newspaper, Mrs. Boykin commented that the Government was "calling" certain bonds. She asked what the expression meant, and the Doctor explained it to her; and she said, "Thank you".

Great stress is laid upon testimony that after Evelyn Sidney Boykin died, the testatrix would not accept the fact of death, and continued to speak of him as being ill and in need of assistance. It is also in evidence that she thought Hot Springs was to be "blown up".

*Fourth—Conflicting Testimony.*—Many of Mrs. Boykin's letters, which are urged by appellants as evidence of mental weakness, were written subsequent to 1938, some as late as 1946—nearly eight years after execution of the will. The trial Court thought any testimony relating to matters occurring more than two years after the will could have but little probative value, and the order excluding that character of testimony is assigned as error. We are not required to pass upon this question,—this for the reason that all of that class of testimony objected to by appellees is to be found in the record.

But we agree in part with the lower Court. Mrs. Boykin was about 77 years of age in 1938, and was almost 85 in 1946. The letters—those admissible and otherwise—disclose a progressive lack of continuity of thought, and there can be little doubt that if the will had been made during Mrs. Boykin's latter days appellant would have a much stronger case.

*Fifth—The Applicable Law.*—The test is whether Mrs. Boykin, on September 13, 1938, had a fair comprehension of the nature and extent of her property, of her relationship to those who had claims upon her, of their

situation as it affects financial need, or financial sufficiency; and of other obligations existing at the time she acted.

Complete sanity, in a medical sense, is not essential; provided, that the power to think rationally exists when the individual's will to act is exercised. The word "will" of itself connotates purpose, intent, deliberation, volition, freedom from unreasonable restraint, voluntariness, desire, the power to choose, discretion.

The natural result of a transaction goes far in determining whether power of discretion exists. Had Mrs. Boykin designated as beneficiaries persons but remotely related to her, or had she named occasional or incidental friends or acquaintances, an inference that mental illness contributed to an unnatural result would arise. Nothing of that kind is present here. For many years relatives who now urge the testatrix' incapacity (some with full knowledge of what was being done) permitted Mrs. Boykin to handle her affairs, to make comparatively large investments,—and in fact to earn money and build up her fortune,—and if it occurred to them that guardianship or direction was necessary, the initiative was neglected.

Appellants now draw upon the testimony of Collins, and underscore idiosyncrasies until imposing obstacles are interposed. There is convincing proof of abnormality a quarter of a century before the will was made, and evidence of intellectual failure attaches to contradictions found in letters written and conversations had several years after the transaction in question was consummated. If to these is added what might be termed questionable conduct concurrent with the will, we are still unable to say that *what* Mrs. Boykin actually did in disposing of her property was not the result of a rational mental process, one exercised by a person who understood the extent of her holdings, her relationship to all parties, and consequences of the course taken.

Letters written by Mrs. Boykin to Wootton early in 1940 were introduced to show the extent to which she carried in memory certain business details. In May she

mentioned having gone to a safety deposit box in an endeavor to locate thirteen shares of T. & T. stock. She owned 63 shares, but could find only 50. A past-due mortgage for $10,000 was mentioned, with the request that collection be effectuated. The debtor, she said, had just called to ask for an extension. At first the request was refused, but "finally I said I would wait until October".

In September she complained of loneliness, saying, "You don't know how uneasy and depressed I am. I just have to sit in darkness and silence, and you don't know how hard it is on my nerves". In May she had written, "It is worry that kills half the people in the world".

September 26, 1939—slightly more than a year after execution of the will—Mrs. Boykin wrote Collins, saying: "I have just received your letter telling me of my mistake about my brother. I thank you for your kindness in replying so promptly to my note. It is a great relief to find out my anxiety was unnecessary".

The foregoing quotations are typical of letters and conversations dealing with business and personal affairs.

As late as December 31, 1943, Collins wrote Mrs. Boykin, saying: "I am enclosing copy of the report of the administration for the year 1943, in the matter of the estate of Alice E. Garnett. Also I am handing you herewith check for $4,853.67, representing the balance of cash on hand due you December 31, 1943, in addition to the twelve monthly allowance checks for $375 each". Collins enclosed a receipt for Mrs. Boykin to sign for the full amount, showing that $1,000 of the sum "is to be invested in Series G Government bonds, and balance of $3,853.67 to be deposited in savings account of Union National Bank of Little Rock".

Admittedly Mrs. Boykin had been in consultation with Mr. Wootton regarding her will, and a preliminary draft was prepared August 26, 1938—two weeks before the final document was executed. At that time the testatrix wrote as follows: "There is a clause in my mother's will saying that I should name who should inherit after

the death of William and Evelyn both. You remember that I named the four Boykin sisters. I wish to continue to name them for this. Be sure to do so in framing this will". August 30, 1938, she wrote Wootton: "I did not make it plain to you that I wish my brother to have the cash of the mortgage when [the mortgage] expires, that I died possessed of, if my brother survives me".

We think the trial Judge correctly found that the testatrix knew enough about her business and her relationships and obligations to direct how the estate should be disposed of.

Affirmed.