THIEL, SPECIAL ADMINISTRATOR *v.* MOBLEY.

5-281 265 S. W. 2d 507

Opinion delivered February 15, 1954.

[Rehearing denied March 29, 1954.]

168

*Rhine & Rhine,* for appellant.

*Cecil Grooms,* for appellee.

WARD, J. On this appeal appellant seeks to reverse a judgment of the Greene County Probate Court which invalidated the will of Hattie Mobley. Appellee, Peyton Mobley, was the husband of Hattie Mobley, and after her will was probated he filed a petition contesting it on the grounds of lack of mental capacity and undue influence. The testatrix died of cancer, and it was alleged that her lack of mental capacity resulted from the use of opiates to relieve pain. It was alleged that undue influence was exerted on the testatrix by her daughter, Fay Lawrence, who is one of the principal beneficiaries.

A careful consideration of all the testimony leads us to the conclusion that the trial court was in error in setting aside the will.

*Background.* Mr. and Mrs. Mobley had been married and had lived together as husband and wife for about 41 years when she died on November 29, 1952. During all the years of their married life Mrs. Mobley ap-

peared to take an active if not a dominant part in all their business transactions which consisted of farming operations. When they were married in 1911 neither one had any property to speak of but they had accumulated about $1,000 by 1936 when they purchased a small farm. In 1942 this farm was sold for a profit and the proceeds used to purchase a more valuable farm, which latter farm was also sold at a profit in 1948 when the farm on which they were living at the time of Mrs. Mobley's death was purchased for $10,000. In each instance the title to the farm was taken in the name of Hattie Mobley. Sometime after 1950 it was learned that Mrs. Mobley had cancer and after two operations she returned to her home in the latter part of 1951 where she remained except for trips to the hospital for checkups. Her condition was such that along about July, 1952, her doctor prescribed morphine and barbiturate compound for pain and rest.

There are two children; a daughter, Fay Lawrence, who lives nearby and who is an invalid, and a son, Dalton Mobley, who is married and also lives nearby. On October 21, 1952, Hattie Mobley executed a will in which she gave her husband, the appellee, the sum of $500 and gave the farm to their son and daughter and also gave them the residue of her personal property which was not of consequential value.

In setting the will aside the chancellor apparently laid more stress on the lack of mental capacity, but undue influence was also noted, and we shall, therefore, consider both grounds.

*Mental Capacity.* Appellee in substance testified, that: I helped to make the deal for the different places and helped to improve them; some of the money had been saved by Mrs. Mobley from rent; part of the time I lived in St. Louis where Mrs. Mobley stayed with me during the winter months and came back to the farm in the summer; Mrs. Mobley started taking morphine about the middle of July, 1952, and continued to take tablets on up until the time of her death; for a while we lived with Fay Lawrence after we sold one of the farms; Mrs. Lawrence

was continually getting after me about my drinking habits; and on the day the will was executed my wife had not been reading on account of her weak eyes.

Several witnesses who were neighbors to Mr. and Mrs. Mobley testified that they visited Mrs. Mobley frequently during her illness both before and after the execution of the will. None of the witnesses were present on October 21 when the will was executed and none attempted to testify regarding her mental capacity at that time. Some stated that Mrs. Mobley was not normal and would not recognize them at times and seemed to be in a stupor but that at other times she appeared all right. Two or three of the witnesses were propounded a hypothetical question in which was explained the legal definition of mental capacity to execute a will and were asked if in their opinion the testatrix had such mental capacity. One answered in the negative and one stated he would not want her to handle a business deal for him.

The trial judge seemed to give much weight to a statement made by one of the two attesting witnesses. This witness stated that after he had hurriedly read the will and had gotten the impression that appellee was to receive only $5 instead of $500 as provided in the will, he asked her if she meant to turn appellee out in the cold and that her answer was "I told the children not to do that." This same witness stated that during his conversation with the testatrix she stated her personal property was not affected, apparently leaving the impression that appellee would get certain personal property under the will.

On behalf of appellant there was testimony to this effect: The two attesting witnesses stated that when they went to the testatrix's home to attest her will she was in the bed, had the will in her possession, and gave it to them, stating that it was her will. They had considerable conversation with the testatrix and one of the witnesses tried to give her a mental test which she apparently passed to his satisfaction. It was their opinion that the testatrix did have sufficient mental capacity to

comprehend what she was doing and to execute the will. The doctor who waited on her and who prescribed the medicines to relieve the pain stated that in his opinion the medicine would not and did not affect her mind, that temporarily they would make her drowsy but that at other times her mental capacity would not be impaired. Neighbors who were in close attendance on Mrs. Mobley shortly before and after the will was executed testified that most of the time there was nothing wrong with her mind and that she was mentally capable of executing the will. It is further shown that the testatrix did transact some business shortly before and after the will was executed. She endorsed one check three days before and one two days after she made her will. An examination of Mrs. Mobley's signature on a photostatic copy of the will shows it to be equally as firm and legible as her signature on an original check dated December 15, 1950, which appears as an exhibit.

The burden was on appellee, the contestant, to prove the lack of mental capacity at the time the will was executed. This court has held many times that the burden of proving mental incapacity to make a will rests on the one alleging it. See *McDaniel, Adm.* v. *Crosby, et al.,* 19 Ark. 533, and *Smith* v. *Boswell,* 93 Ark. 66, 124 S. W. 264.

The evidence clearly shows that, notwithstanding Mrs. Mobley was mentally retarded at times as a result of taking opiates to relieve the pain, there were intervals at which time she was not affected mentally but was fully capable of comprehending ordinary business transactions. During these latter intervals she unquestionably had testamentary capacity. There is a complete absence of proof that it was not during one of these lucid intervals that the will in question was executed, but on the other hand there is positive evidence that it was executed at a time when her mind was not affected by the medicines which she had been taking—at least not to the extent that she lacked testamentary capacity. In 56 Am. Jur., page 89, under subject of "WILLS" and under the subhead of "Lucid Intervals" it is stated: "A will executed in a lucid interval by one who was before and after

a confirmed lunatic is valid. . . .'' The following section, also in point here, states that ''The time to be looked to in determining the capacity of a testator to make a will, in reference to his mentality, is the time when the will was executed.'' This court in the case of *Scott* v. *Dodson, Executor*, 214 Ark. 1, 214 S. W. 2d 357, refused to invalidate a will where, in our opinion, the evidence pointing to lack of testamentary capacity was stronger than it is in the case under consideration. Among other things it was there stated: ''Complete sanity, in a medical sense is not essential; provided, that the power to think rationally exists when the individual's will to act is exercised.'' A similar case with like results is *Puryear* v. *Puryear*, 192 Ark. 692, 94 S. W. 2d 695, where it was recognized that if other evidence tended to establish an impairment of the mind of the testator, then the manner of the disposition of the property would be admissible to be considered with such other evidence. It is argued in this case that it was not normal or natural for Mrs. Mobley to leave her husband only $500 instead of the rights he would have had in the property if no will had been executed, but we do not think this circumstance is persuasive and certainly not controlling under the evidence in this case. It must be remembered that the property was in the name of Mrs. Mobley, that she had an invalid daughter, that she knew her husband was addicted to drink, and that, as shown by the evidence, she had for sometime before the execution of the will considered the disposition of her property. While appellee's status under the will may be calculated to arouse sympathy for him, it does not reasonably follow that the disposition which the testatrix made of her own property indicates that she did not realize the full import of the disposition she made of her property in her will. The courts are not concerned with what prompted her actions as long as they appear to be reasonable. She might have felt that her son and daughter would always see to it that their father had a home. It is noted that when her daughter was asked by one of the attesting witnesses if she expected her daddy to stay by himself, she answered, ''I would never turn my daddy away. I love my daddy.''

*Undue Influence.* Undue influence is based principally on the testimony tending to show: That Fay Lawrence, the daughter, apparently did not think too much of her father's ability to control property and expressed the fear that he might squander it on drink; that she had made statements to this effect during the early part of her mother's sickness; that she had been instrumental in assisting the attorney to write the will, and; that Mrs. Lawrence had at one time indicated to her mother that a small portion of the personal property should go, as provided in the will, to one of the testatrix's grandchildren rather than another one. It was further shown that Mrs. Lawrence sent for the attesting witnesses. Mrs. Lawrence herself denied that she had in any way unduly tried to influence her mother. It does appear that Mrs. Lawrence did contact an attorney with reference to the will or the disposition of the property but it also appears that she did so at the direction of her mother.

It is our opinion that the above testimony along with other testimony of a similar nature falls short of the legal requirements to prove undue influence. In the case of *Puryear* v. *Puryear, supra,* the applicable rule was announced in the following language, citing from another case:

" 'As we understand the rule, the fraud and undue influence which is required to avoid a will must be directly connected with its execution. The influence which the law condemns is not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion, or any other cause deprives the testator of his free agency in the disposition of his property. And the influence must be specifically directed toward the object of procuring a will in favor of particular parties. It is not sufficient that the testator was influenced by the beneficiaries in the ordinary affairs of life, or that he was surrounded by them and in confidential relation with them at the time of its execution' ".

*The Right to Appeal.* It appears from the record that the original executor, Murphy Hubble, was re-

lated to both sides and did not want to be a party to an appeal to this court. Under the circumstances the trial court appointed George Edward Thiel, a disinterested party, as special administrator for the purpose of prosecuting the appeal.

We cannot agree with appellee in his contention that the trial court had no right to make the appointment for the purpose mentioned. Full authority for the court's action is found, under the heading of *Special Administrator,* in § 79, Act 140 of 1949, now appearing as Ark. Stats. Supp. § 62-2210.

Pursuant to the views above expressed that portion of the trial court's judgment invalidating the will is reversed and the cause of action, apparently fully developed, is dismissed.

J. SEABORN HOLT, J., dissenting. The trial court found that Hattie Mobley (deceased) at the time of the execution of the will here in question lacked mental capacity and ordered its probate set aside and the will declared void. The findings of the Chancellor contained these recitals:

"In this case we have direct and positive testimony that leads me to the inevitable conclusion that whether it was occasioned by the weakness of the body or the weakness of the mind or the effects of opiates or drugs, whether or not it was caused by undue influence or what it might have been caused by, I am led to the inevitable conclusion that she did not know and understand the contents of that will. Here are the men who witnessed the execution of the will, being more familiar with the legal terms, but as he expressed it, he galloped through the will, but he determined the effect of it and asked if Peyton was to be turned out in the cold and her answer was, as I wrote it down as he stated it, 'I told the children not to do that.' And yet the will did just that. That statement could mean several different things. It could mean the instructions in the preparation of the will and told them not to give that or it might have meant the promise that that would not be done

before the will could be executed. But that is not all. She goes farther and says, 'But Mr. Ahlf, he is to get the cattle and the other personal property around here.' But that will specifically devises and bequeaths to him, $500 and $500 alone and divides all the rest and residue of the property, real, personal and mixed so the evidence is clear and conclusive and convincing that she did not, at the time of the execution of the will, know and understand the contents of the will and that is the positive testimony of the attesting witnesses, both of them, stated in detail by one and confirmed as being as Mr. Ahlf has stated it by the other. The very statements she made, the very terms show that she did not know and understand the contents of the will.''

While we try the case *de novo,* we must affirm unless we can say that such findings are against the preponderance of the testimony, and in this particular kind of a case we have frequently said that the findings of the Chancellor have persuasive authority and are entitled to weight and consideration.

In *West* v. *Whittle,* 84 Ark. 490, 106 S. W. 955, we said: '' 'And in a court of equity, where bad faith and unconscionable acts can have no allowance or favor, the strength of mental capacity of the parties, the circumstances surrounding them, their relationship, etc., make up the grounds upon which the court can find the real influences that produced the conveyance. And when it is discovered that the party in whose favor the conveyance was made possessed an undue advantage over the grantor, and in person, or by agent, exercised an improper influence over such one, and to the advantage of the grantee, it is an act against conscience and within the cognizance of a court of equity.'

''The chancellor found that the whole substance of this transaction shows a want of capacity or undue influence; and, as said in the case of *Boggianna* v. *Anderson,* 78 Ark. 420, 94 S. W. 51, this kind of case is one where the chancellor's finding has persuasive authority, and is entitled to weight and consideration.''

"Mental weakness, though not to the extent of incapacity to execute the instrument designated, 'may render a person more susceptible of fraud, duress, or undue influence, and, when coupled with any of these, or even with unfairness, such as great inadequacy of consideration, may make a contract voidable, when neither such weakness nor any of these other things alone, or of themselves, would do so.' 8 Sup. Elliott on Contracts, § 365; *Hightower* v. *Nuber,* 26 Ark. 604; see *West* v. *Whittle,* 84 Ark. 490, 106 S. W. 955, and cases there cited; also *Jones* v. *Travers,* 116 Ark. 95, 172 S. W. 828; *Morton* v. *Davis,* 105 Ark. 44, 150 S. W. 117; *Boggianna* v. *Anderson,* 78 Ark. 420, 94 S. W. 51." *Pledger* v. *Birkhead,* 156 Ark. 443, 246 S. W. 510.

I think the preponderance of the testimony, as the Chancellor found, brings this case clearly within the above rule.

I would affirm.

Justices MILLWEE and ROBINSON join in this dissent.