BRUERE *v.* MULLINS.

5-1671                                    320 S. W. 2d 274

Opinion delivered January 12, 1959.

[Rehearing denied February 23, 1959]

*Mahony & Yocum & Eugene R. Warren,* for appellant.

*Brown & Compton,* for appellee.

CARLETON HARRIS, Chief Justice. This is a will contest. K. W. Bullion of El Dorado died on February 12, 1957. Among his effects was found the will here in question. Under the terms of this instrument, $2,500

was left to the Roman Catholic bishop of Little Rock to be used for the best interest and welfare of the Church of the Holy Redeemer in El Dorado, and the balance of the estate was devised to appellee herein, M. E. Mullins. Appellants, a niece and nephew of the deceased, filed a petition objecting to the admission of the said document[1] to probate as the Last Will and Testament of K. W. Bullion, alleging that K. W. Bullion lacked the mental capacity to make a will on April 16, 1954 (execution date of the will), and later amended the petition to further allege that appellee exerted and exercised undue influence on the deceased, "causing him to disinherit his kin and devise his entire properties to her." The court was asked to declare the instrument null and void. Following the filing of a response to the petition and amendment, denying such allegations, and after various other motions and orders, the cause proceeded to trial. Subsequent to a lengthy and extended hearing, the court found that K. W. Bullion was mentally competent to make the will, that no undue influence was exercised upon him, and that the instrument should be admitted to probate as the Last Will and Testament of the deceased. From such order, comes this appeal. Five points are relied upon by appellants for reversal, the first three relating to the alleged lack of testamentary capacity, and the allegation of undue influence. Point four deals with the failure of the trial court to admit the deposition of Judge George LeCroy, a close friend of Bullion for a number of years, and it is finally contended that the purported will was not executed, witnessed, or published in accordance with law.

Before examining these specific points, it might be said that we see no need to relate the testimony in detail. Twenty-nine witnesses testified, nine for appellants, including one of the contestants, and twenty for appellee, including contestee. Some of the evidence was near revolting (certain letters from appellee to deceased), and a detailing of such evidence, and a pro-

---

[1] The will had been discovered by the nephew, who had previously been appointed administrator of the estate.

longed discussion of the testimony of the various witnesses, could serve no useful purpose, since there is no unusual point in the litigation, nor any phase that could make this opinion worthwhile as a precedent. After all, the law governing testamentary capacity and undue influence has long been established in this state, and the outcome of this litigation, as far as appellants' first three points are concerned, depends entirely upon the weight of the evidence. With this preliminary statement, we proceed to a discussion of whether K. W. Bullion possessed the mental capacity to execute the will in question.

Appellants' evidence reflected that K. W. Bullion divorced his wife in 1945. According to some witnesses, a gradual personality change began in 1946. Though having formerly been a meticulous and neat dresser, he became slovenly in his dress and habits . . . extremely hard to please . . . careless with his insurance business . . . though formerly a member of the country club and an attendant at parties, he subsequently abandoned his close friends and pulled away to himself . . . was forgetful . . . had delusions of persecution. According to Dawson Hawkins, an insurance agent in El Dorado, and formerly associated with deceased, Bullion had the idea that people were entering the office at night, and he stated that Bullion had locks changed on the doors of both the office and his home . . . witness was told by Bullion that people were coming into his home . . . this knowledge was gained by stretching wires across the backyard and observing where someone had tripped over the wires and fallen . . . people followed him in his car . . . in 1948 or '49, Bullion began to carry a gun . . . he would get mad at a waitress and require her to bring him additional glasses of water, but would then tip her $5 or $10. It was the witness' opinion that Bullion was not mentally competent to make a will after the middle of 1949. Appellants' evidence reflected that Bullion became interested from time to time in several young women (hereafter mentioned), in their 20's, and

in 1952, he married a young woman named Madolyn. She almost immediately divorced him, and received a property settlement of $50,000 and a Cadillac. According to the testimony, he became enamored, in the early part of 1953, with a young woman named Beth, and sent his nephew to determine whether this woman would marry him. The nephew, one of the appellants herein, discovered that Beth was holding $1,500 belonging to his uncle, and insisted that it be returned. This fact was later learned by Bullion, who apparently considered the nephew's action as interference in his personal affairs, and was deeply resentful. Bullion subsequently became interested in two young women, sisters, named Duke, and sent each large sums of money. Among other witnesses, in addition to the appellant nephew, who testified that in their opinion, Bullion was not competent in 1954, were Lizzie McClellan Davis, Bullion's part-time housekeeper (this testimony was rather weak evidence), Tom Moore, a long time friend, Dr. E. J. Munn, family physician for many years, and Carolyn Price, who was Mr. Bullion's secretary for ten years. Father Thomas Walshe, a Priest, formerly of El Dorado, also a friend of Bullion's, testified that he considered Bullion incompetent, and observed personality changes as early as 1938; however, he had only seen Bullion approximately a half dozen times since 1940, and had not seen him at all since sometime in 1952, just prior to his marriage to Madolyn. Probably appellants' strongest evidence, relative to the alleged incompetency of Bullion, was the testimony of Dr. Munn. Dr. Munn testified that in his opinion, Bullion was not competent, because of senility[2], to make a will in the spring of 1954. He stated that the latter had suffered from hypertension and arteriosclerosis[3], the latter a progressive hardening of the arterial system, causing the muscular walls of the arteries to become less pliable, and affecting the blood supply to the brain. According to his testimony, this condition is progressive, and increasingly slows down the physical and

---

[2] On re-direct examination, he testified that Bullion's senility was more than normal senility; he was suffering from senile dementia.

[3] Numerous physical ailments were also mentioned.

mental reactions of the person affected. Dr. Munn is a general practitioner, and admittedly has never specialized in mental diseases. Actually, we do not consider the Doctor's testimony to be overly impressive. He appeared, on cross-examination, to be somewhat reluctant to give direct answers, and some of his statements were a bit surprising. For instance, he stated that "old age" might commence at the age of 40. It was his opinion that the average person 60 years of age, suffers from some degree of senility. Further, from his testimony:

"* * * Your position, as I understand, as having been stated by you, is that when a man arrives at the age of sixty-five years of age, senility has set in?

A. Sixty-five?

Q. Yes. And this senility has set in to the point that the average person, now, now the average person, having arrived at the age of sixty-five, does not have the capacity to understand his properties and his (interrupted)

A. The valuation of everything he does, now?

Q. He doesn't have the proper evaluation of things —(interrupted)

A. In a true business way.

Q. And he doesn't, then, have the capacity to make a will after that time, without help?

A. Help in some way.

Q. Help in some way?

A. Is going to have to get help in some way. He is going to consult somebody. He is going to have an advisor.

Q. Suppose he doesn't have an advisor, what do you say about that?

A. He better find one.

Q. He better find one?

A. Yes, sir.

Q. Because the average person, if he doesn't do it, you say that that instrument is such — subject at all times to attack because he did not have the capacity, standing alone, to make that?

A. The average person.

Q. That is true, is it?

A. That's true."

We are prone to feel that this witness' opinion as to the senility of Bullion was based to some extent upon his opinion as to when senility commences, rather than solely upon Bullion's apparent mental condition at the time.

On the other hand, numerous witnesses testified that Bullion appeared normal in 1954 and thereafter, and they noted no change from his previous mental condition. Among those so testifying, were Mrs. Mary Engelke, a neighbor, Mrs. Marshall Craig, Jr., a next door neighbor, Tom Plair, who had some business dealings with Bullion, Mrs. Margaret Craig Parham, a neighbor, Joe Dunn, yard boy, T. P. Oliver, attorney of El Dorado, Sam D. Babb, president of the National Bank of Commerce of El Dorado, Jimmy Wilkins, operator of a laundry and dry cleaning plant at El Dorado, who had been acquainted with Bullion for 25 years, Eddie Stringfellow, shop foreman for the George Morgan Pontiac Company, who serviced Bullion's automobile, Ned Wilfong, in the oil production business, who had transacted business with Bullion in 1953 or 1954, and Henry Crook, grocerman, who had known Bullion from 1944, and saw him nearly every day. Their testimony reflected his conduct to be entirely normal . . . the reading of daily newspapers, Reader's Digest and Life magazines . . . listening to the radio . . . playing cards and dominoes. Witness Oliver testified that they discussed politics, baseball, and that he noted but little deterioration in Bullion's physical appearance until five or six months before the latter's death . . . witness noted no change in Bullion's mental status, even on the last oc-

casion when they talked together, which was only a few days before Bullion's death. Neighbors testified that he talked about current events, children, and flowers, that his conversations seemed to be normal, and he appeared entirely clear in his thinking.

While according to appellants' evidence, Bullion did commit some acts which, to the average mind, would appear rather eccentric, and perhaps indicate an over-wrought imagination, such acts would not necessarily establish an impairment of testamentary capacity. There does not appear to be any connection between the alleged delusions (if such there be), and the making of the will. In probably one of the longest opinions ever handed down by this Court, *Taylor* v. *McClintock,* 87 Ark. 243, 112 S. W. 405, a case with 51 headnotes, the subject of testamentary capacity, insane delusions, and insanity, generally, is thoroughly discussed. Relative to delusions, the Court, quoting other Arkansas cases, said:

"The law now recognizes the fact, well established by the investigation and observation of medical experts, that there may be a derangement of mind as to a particular subject and yet capacity to comprehend and intelligently act on other subjects.   *   *   *   The fact that the grantor was a monomaniac, and possessed of insane delusions on some subjects not connected with the conveyance or the matters out of which it grew, is not sufficient to invalidate his deed. To have that effect, the insane delusion must be such as to disqualify him from intelligently comprehending and acting upon the business affairs out of which the conveyance grew. *   *   *   It is unquestionably true that one may be possessed of a delusion concerning one subject and yet be of sound mind on all other subjects, according to the weight of modern authority, and this should be so declared as a proposition of law.   *   *   *"

However, irrespective of this established law, in the litigation before us, as previously stated, numerous people who had daily contact with Bullion testified as to his normal behavior and mental competence, and, as

stated by the trial court, "In addition, there is in evidence the personal records which he kept up to a short time before his death in which he minutely detailed his every day business affairs." While irritability and an overfondness for young women are not admirable characteristics, such traits do not establish incompetency. From a careful reading of the testimony, we are unable to say that the Chancellor's finding that K. W. Bullion was possessed of testamentary capacity at the time of the making of the will, is contrary to the weight of the evidence.

The testimony reflects that appellee lived in Union County from the time she was ten or eleven years of age, except for several years in college, until 1944, when she joined the army as a WAC. According to her evidence, she began keeping company with Bullion in December, 1942, at which time she was 25 or 26 years of age and Mr. Bullion was in his late 50's, and continued to keep company with him until she entered the army. Upon returning, the previous relationship was resumed, except for the period of his marriage to Madolyn in 1952. In October, 1955, appellee went to New Orleans, and subsequently to Tulsa, Oklahoma, during which time, almost daily letters were written between the parties. According to her testimony, she last saw Bullion during Christmas, 1956, and learned, for the first time, of the existence of the 1954 will. It was during this period of courtship and correspondence between the parties, that Bullion became interested, from time to time, in the other young women previously mentioned. While the evidence reflects that gifts of money were made to some of the others, appellee contends that she only exchanged gifts with Bullion, giving as much as she received. Appellants' evidence does not establish otherwise. The contention of undue influence is principally based upon the letters written by appellee to Bullion, establishing that the two had been sexually intimate. However, the letters make no demand upon Bullion concerning money or property, and clearly establish that

she knew he was interested in, and spending his money on other women.

Our views, relative to the issue of undue influence, are well expressed in the Chancellor's written opinion, wherein he said:

"In view of the letters introduced, which were written by the beneficiary under the Will, the second count of the exceptions to the Will, *viz.,* "Undue Influence", presents a more serious problem. However, our Supreme Court has often said that one having the testamentary capacity to make a will, is not required to mete out equal and exact justice to relations, and the motives or partiality, affection or resentment by which they are influenced are not reviewable; and if one has the capacity to make a will, he may make it as eccentric, injudicious and unjust as caprice, frivolity or revenge can dictate.

"No doubt there existed an illicit relationship between the deceased and the beneficiary, but it is also apparent that she, at no time, over the years, took advantage of deceased by reason thereof. The testimony disclosed that when a gift was made to beneficiary by the deceased, she reciprocated by giving him a gift of comparable value. The evidence also disclosed that deceased had given other women friends large gifts from time to time, and there is no evidence that either of them gave gifts in return. It also appears from the evidence that shortly before or about the time of the execution of the Will in question, one of those women friends to whom a large gift was made was contacted by one of the contestors of this Will, and the gift was recovered by him, which no doubt, was the reason for the "falling out" of the deceased and the contestor." As did the Chancellor, we likewise hold that such contention was not established.

It is next alleged that the court erred in refusing to admit the deposition of Judge George LeCroy, an attorney of El Dorado, a close friend, and attorney for deceased. Judge LeCroy was in bad health (which was

the reason for taking the deposition), and in fact, died before the trial of the case. The court's refusal to admit this evidence was based upon the fact that appellee did not receive sufficient notice of the taking of the deposition. While we agree with the holding of the trial court, a discussion of this contention is deemed unnecessary, since we do not consider that this evidence would have added sufficiently to appellants' case to establish the preponderance necessary for a reversal.

This brings us to consideration of appellants' final contention. K. W. Bullion's will recites *inter alia* that he is of sound and disposing mind and memory, and the attestation clause recites that the will "\* \* \* was signed by the said K. W. Bullion in our presence and by him published and declared as and for his Last Will and Testament and at his request and in his presence, and in the presence of each other, we hereunto subscribe our names as attesting witnesses at El Dorado, Arkansas, this 16th day of April, 1954." The attesting witnesses are Robert H. Archer and D. M. Hawkins, and their respective addresses in El Dorado are listed. Neither of the witnesses, in their testimony, seemed to have much recollection about the occurrence. Archer testified that it appeared to be his signature, and that he had attested a will for Bullion. He stated that as far as his personal relationship with the latter was concerned, he had no reason to question the mental capacity of Bullion, and that he really could not say whether Bullion was competent or incompetent at the time. Hawkins testified that he had witnessed several wills for Bullion between 1948 and 1954. He identified his signature to the will in question, but stated he did not think any will made by Bullion after mid-1949 was any good. We consider appellants' contention to be without merit. The testator's signature on the will is not questioned, and the evidence shows that the will was found among his effects. Of course, after several years, attesting witnesses rarely remember any details or circumstances surrounding the witnessing of a will, and the testimony of the attesting witnesses is not unusual

in that respect. Both recognized their signatures, and Archer stated that he had no reason personally to question the testator's competency. While Hawkins stated that he did not consider Bullion competent after 1949, it will be noted that this statement covers a general period of time, rather than the particular occasion on which the will was executed. Further, such evidence is due to be closely scrutinized. As stated in American Jurisprudence, Volume 57, page 133, paragraph 145:

"It is generally held that when an attesting witness attempts to impeach a will by testifying that the testator did not have testamentary capacity, his evidence will be received with suspicion and the utmost caution, * * *. Such testimony is deemed to reflect on the credibility of the witness. The theory is that the fact that a person voluntarily identifies himself with the execution of a will and a witness, is an indication that, in his opinion, the person executing the instrument is competent so to do."

To the same effect is our holding in *Leister* v. *Chitwood,* 216 Ark. 418, 225 S. W. 2d 936.

Concluding, let it be remembered that approximately three years elapsed from the time of the making of the will until Mr. Bullion's death. During a good portion of that time, appellee was away, in New Orleans or Tulsa, without opportunity to personally exert any influence upon the testator. He had every opportunity to revoke the will had he desired to do so, and the evidence reflects that he had several times revoked other wills executed by him. Also, this is not a case wherein a child, or one living in the home and closely associated with the testator, is disinherited. The relationship of nephew and niece to uncle is not, within itself, a particularly close relationship, nor is there evidence that would establish an unusually close connection between the parties herein. There is no evidence that would establish such a relationship between the niece and Mr. Bullion, and the record reflects that Bullion never had anything further to do with his nephew after the inci-

dent concerning Both, hereinbefore referred to. On the whole, appellants have fallen short in meeting the burden of proof necessary to invalidate the will.

The judgment of the Probate Court is affirmed.

Justice JOHNSON not participating.

Justice HOLT dissents.

J. SEABORN HOLT, J., dissenting. It is true that a donor has the right to dispose of his own property as he chooses. It is equally true, however, that such a right is not unlimited. When it is shown that the maker of a will lacks the mental capacity to make a will, or that he was subjected to undue influence in making it, then the will should be declared invalid. After carefully considering the evidence presented, I am convinced that K. W. Bullion, at the time the will in question was made—April 16, 1954, was not mentally competent to dispose of his property and was the victim of the undue influence of a shrewd, designing, scheming and an admittedly immoral and unprincipled woman, appellee.

Here we are dealing with a mentally weakened man, easily influenced, who was in his late fifties who fell under the spell of a woman in her middle twenties, not related to him in any manner, and who willed his entire estate of about $50,000 (except $2,500 to the Catholic church) to her and gave nothing to appellants, who were his nephew and niece, who had his love and affection until appellee intervened, and would have inherited his property had he died intestate. Among the tests of testamentary capacity the most commonly used and pointed out by this court are: (1) Was this a natural or unnatural will; (2) what was the testator's physical condition; (3) what was the opinion of the family physician; (4) what was the opinion of the subscribing witnesses; (5) what was the lay opinion by his intimate friends and family; (6) how had the testator conducted his business and affairs at the time or prior to the execution of the will; and (7) had the testator undergone marked personality changes prior to the execution of the will.

To me this was a most unnatural will. ". . . evidence of an unnatural disposition of his property by a testator is admissible as a help to be considered with the other evidence as tending to show an unbalanced mind or a mind easily susceptible to undue influence. In other words, it is a help which the jury may consider in connection with the other evidence in passing upon the soundness of mind of the testator," *Howell* v. *Miller,* 173 Ark. 527, 292 S. W. 1005. The present will was unnatural.

Until appellee came on the scene the evidence showed that the testator had a warm affection for his niece and nephew and in previous wills he had made his nephew, Bruce, his heir. The evidence shows that Mr. Bullion's physical condition had deteriorated until he was almost helpless at the time of the execution of the will. His life-long family physician, Dr. Munn, testified without reservation that he was incompetent when he made the will, that he lacked mental capacity to make a will, that he had been treating Mr. Bullion for twenty years or more. Mr. Bullion became almost a recluse. He had few friends with the exception of Tom Moore, Dawson Hawkins and Judge LeCroy. His physical condition was so bad that he needed constant attention from his family physician. There is no question about the high qualifications of Dr. Munn as a physician.

One of our outstanding authorities on wills, Mr. Schouler, in his book on *"Wills, Executors and Administrators,"* § 97, page 106, uses this language: "Where one's mental condition appeared to his medical attendant suitable for the testamentary act, or the reverse, shortly before or after the will was made, testimony to this purport should carry great weight." Other witnesses testified that he walked with a peculiar tottering gait, had to have assistance in getting in and out of cars, needed constant attention; had to have a nurse with him at all times during the day and a colored boy at night, was unable to control himself physically. Appellee, Mullins, testified that at the time of the execution of the will he was so agitated and upset he was unable to sign his checks or list his household

expenditures, and it was three or four months before he was able to resume signing his checks.

In the present case there were two attesting witnesses, one a close and lifelong friend of the testator and the other a casual acquaintance. Dawson Hawkins, one of these witnesses, a man of unquestioned integrity and who had known the testator, Mr. Bullion, for a decade or more, and was very close to him, testified that in his opinion Mr. Bullion did not have mental capacity to make a will; that he did not possess the capacity to know the condition and extent of his property; nor to know the just deserts of those to whom he would normally leave his property. He further testified that he witnessed the will to humor Mr. Bullion, and that Mr. Bullion did not know what he was doing at the time the will was executed. The other subscribing witness stated that he could not say whether Mr. Bullion was competent or not, that he was merely an acquaintance of Mr. Bullion.

Here the testimony is undisputed that Mr. Bullion had been living in immoral relations with appellee for many years prior to the execution of the will, at the time it was executed, and until his death. She brazenly admitted writing him the most obscene letters on sex (too obscene to be presented in any court record) and to using every method at her command to excite and accommodate the sexual desires of this sex crazed man. There is no evidence that she was in love with him, ever had any intention of marrying him, and to me it is obvious that her one and only motive was to induce him, in his weakened mental and physical state, to will all of his property to her, a stranger to the blood. Just here it may be said that the Catholic priest to whose church the will provided a gift of $2,500, frankly testified that he did not think Mr. Bullion was competent to make the will in question and apparently his church has made no demand for this $2,500.

*Thiel, Special Adm.* v. *Mobley,* 223 Ark. 167, 265 S. W. 2d 507, "Mental weakness, though not to the extent of incapacity to execute the instrument designated, 'may render a person more susceptible of fraud, duress, or undue influence, and, when coupled with any of these, or even

with unfairness, such as great inadequacy of consideration, may make a contract voidable, when neither such weakness nor any of these other things alone, or of themselves, would do so'.'' *Alford* v. *Johnson*, 103 Ark. 236, 146 S. W. 516, ''. . . the proof of such undue influence may be made, not only by direct and positive testimony, but by facts and circumstances from which such undue influences may be reasonably inferred. And this proof is permitted to take a very wide range. There must be free agency on the part of the testator, but in order that there may be such free agency there must be a state of mind on his part free to act, and if, therefore, he is restrained or coerced unduly by the relation he bears to, or the influence exercised by, one over him in the execution of his will, his free agency is to that extent destroyed. . . . There is a distinction between influence exerted through a lawful relation and that exercised by one occupying an *unlawful and adulterous relation. Much less evidence will be required to establish undue influence on the part of one holding wrongful and meretricious relations with the testator.* . . . The testimony adduced in this case was not only sufficient to warrant a finding that there existed wrongful sexual relations between the testator and the proponent of this will, but it was sufficient also to prove a course of adulterous conduct between them that continued for years. . . . The jury were warranted in finding that the testator was influenced during the entire latter portion of his life by the appellant, who obtained an ascendency over him that dominated him. . . . Under these facts and circumstances, we are of opinion that the jury were warranted in finding that the proponent of the will, who had lived with the testator in adultery for all these long years, exercised over him an influence that destroyed his free agency and caused him to forget the relation and deserts of his own flesh and blood, and to make her in effect the sole beneficiary of his bounty.'' This case is on all fours with the case at bar.

In addition, the proof in this case appears to be undisputed that Mr. Bullion dissipated at least $150,000 during the last few years of his life, $100,000 of which is unexplained.

I am convinced, on the record before us, that the great preponderance of the evidence shows that Mr. Bullion was so weak physically, and his mind so weakened by disease, senility, and insane delusions, that he was incapable of executing a will on April 16, 1954. I would reverse the judgment with directions to deny the will to probate.