PARETTE *v.* IVEY, EXECUTOR.

4-7748                                    190 S. W. 2d 441

Opinion delivered November 19, 1945.

365

*Ben D. Rowland* and *Edward H. Coulter,* for appellant.

*J. A. Weas,* for appellee.

Holt, J. Mary Edna Grimes died testate December 8, 1944. Appellant, E. T. Parette, an only brother, sought to prevent the probation of the will on the grounds of lack of testamentary capacity and undue influence at the time the will was made.

Under the terms of the will, Mrs. Grimes gave a part of her real property to Carolyn Benson, a niece, and the remainder, both personal and real, to "my dear friend, Joe J. Ivey," and appointed him executor without bond.

The trial court, after hearing the testimony, found against appellant's contentions, and admitted the will to probate. This appeal followed.

The questions to be determined are: Did Mrs. Grimes lack mental capacity when she executed the will, and was she unduly influenced? The two questions are so interwoven that we consider them together. *Brown* v. *Emerson,* 205 Ark. 735, 170 S. W. 2d 1019.

The burden of proof was on the contestant, appellant. *Smith* v. *Boswell,* 93 Ark. 66, 124 S. W. 264.

The cause comes here for trial *de novo* and unless we can say that the decree is against the preponderance of the evidence, we must affirm it. *Brown* v. *Emerson, supra.*

After reviewing all of the testimony, we are unable to say that it does not support the findings and decree of the trial court.

Much of the material testimony is in conflict. Mrs. Grimes suffered a paralytic stroke on the morning of October 16, 1943, and on the afternoon of that day she executed a will—not in controversy here. Thereafter, on November 11, 1943, she executed another will, the one here in question. She was confined in a local hospital from the 17th to 27th of October, 1943, and thereafter in her home until her death.

Dr. A. R. Sparks testified that he attended Mrs. Grimes from October 17th to November 15, 1943; that while she was in the hospital, he saw her once or twice a day, and three or four times between the date she left the hospital and November 15th. He testified: "Well, she seemed to be in control of her faculties; that is, she was aware of her environment. Q. (Mr. Weas) Was she always cooperative? A. Yes, sir. Q. And responded immediately to any of your questions? A. Yes, sir; she was surprisingly alert. Q. In your opinion, from the time you started to treat her until the last call you made, taking into consideration her responses to your questions and cooperation, would you say she was capable of knowing and transacting business? A. Well, I really believe she was. Most of the times, I would say that a patient in that condition wasn't, but she seemed to be mentally clear the whole time. Q. She seemed to be mentally clear? A. I would say I would feel sure that she would know what she was doing. Q. And know how to transact business? A. I believe so."

Dr. Howell Atkinson saw the deceased only once, and that was on October 16th, when she suffered the stroke. He testified: "A. Just as I said ,I think she was physically unfit, and mentally, too, to transact any business

the day I saw her. Now, before that, I don't know, and, after that, I don't know.''

Dr. Annie Bremyer, a chiropractor, saw Mrs. Grimes professionally November 11, 15, 19, 22, 25, 29; December 3, 6, 10, 13, 17, 31, 1943, and on eleven other occasions after December 31st and it was her opinion that Mrs. Grimes was mentally competent at the time she made the will in question here. She was present on November 11th when the will was being discussed by the deceased and her attorney, Mr. Weas; that on that occasion the deceased discussed and named her relatives, and in witness' opinion realized the claims and deserts of her relatives and those close to her, and knew perfectly what she was doing. Mr. J. A. Weas, the attorney who drew both wills, corroborated Dr. Bremyer's testimony.

Mrs. Pearl Coors testified: ''A. When Joe first came out there, he used to play with my boys, and he couldn't have been better to Mrs. Grimes if he had been her own son. When he first went to work for the WAP (WPA), he came in and gave Mrs. Grimes his check. She said, 'Well, I have got to do so-and-so for my boy. That's all he wants from me, is money to buy him his lunch or for me to fix his lunch.' He gave her his check all the time. When he came back from the army, he hadn't been long out when she had this stroke, and when she came back from the hospital nobody in the neighborhood took care of her except Joe, and nobody had much time except, as I said, I did. I went over there one to six times a day. I did her washing and Joe helped me. When she came home from the hospital—her family insisted on her going to the hospital—when she came back, there were no neighbors to sit with her, and it was my job to look up somebody to stay with her, day and night. When she first came back from the hospital, she had bed-sores on her back as big as that. When she died, there were no bed-sores on her anywhere. Mr. Coors' mother was sick and I took care of her. She was nice and clean, and had everything she wanted to eat. Q. What was the condition of her mind? A. Well, I tried to get her not to give Carolyn anything. She told me, No, she knew definitely what she

wanted to do. There wasn't a thing the matter with her mind. The day before she passed away, I was over there and her mind was just the same as it was when she moved there, ten years ago.''

Mrs. Annie Priest testified that appellee, Joe Ivey, lived in the home of deceased seven or eight years and that during the last few years of her life she depended largely upon him for support; that when he went into the army he sent her a check every month; that he was good to the deceased and ''was a better boy to her than lots of sons to their own mother.''

We quote from the testimony of Mrs. Minnie Shelton: ''Well, I don't think a son could have taken care of her as well. I know that he stayed with her day and night during the whole time after she came back from the hospital, and he fed her every bite she ate, and cooked the biggest part of the meals—most all of them.''

Mrs. Eunice Hardy testified: ''Well, an own son couldn't have done as much as he did.''

Testimony similar in effect was given by a great many neighbors of the deceased, some of whom visited her almost daily after her stroke until the time of her death. There is also testimony that many of these neighbors counseled and advised Mrs. Grimes to remember appellee, Joe Ivey, in her will.

As has been indicated, there is testimony on the part of appellant contradicting that offered by appellee. The majority of these witnesses were related to appellant. Mrs. Carolyn Benson was his daughter, Mrs. E. T. Parette, his wife, Mrs. Leona Green, another daughter, Cecil B. Green, a son-in-law, and Elmer Parette, a son. Appellant testified: ''Q. I want to ask you just one question. Did you furnish to your sister, Mrs. Grimes, the money, or any part of the money, with which she purchased the property where she lived at the time of her death? A. I brought a certified check from Morrilton down here for $1,600. That's what I brought,'' and ''A. Paid back? No, sir. No, sir; they never paid me anything, no.''

We do not attempt to set out the testimony in detail, for as above noted, on the question of testamentary capacity, it is in hopeless conflict. As was said by this court in *Puryear* v. *Puryear,* 192 Ark. 692, 94 S. W. 2d 695: "It is elementary that, subject to statutory restrictions, every person of sound mind and disposing memory has the untrammeled right to dispose of his property by will as he pleases, however capricious and unjust such disposition may appear to be. Sound mind and disposing memory constitutes testamentary capacity which is said to be the ability of the testator to retain in memory without prompting the extent and condition of the property to be disposed of, to comprehend to whom he is giving it, and to realize the deserts and relations to him of those whom he excludes from the will. *Taylor* v. *McClintock,* 87 Ark. 243, 112 S. W. 405. This definition presupposes a mental capacity sufficient to execute a will free from undue influence. *Tobin* v. *Jenkins,* 29 Ark. 151. With respect to the ability to know the extent and condition of the property to be disposed of and to whom it is being given, and to appreciate the deserts and relations to the testator of others against whom he discriminates or excludes from participation in his estate, it is unnecessary that he actually has this knowledge. It is sufficient if he has the mental capacity to understand the effect of his will as executed. 'Capacity to understand the effect of making one's will, and not actual understanding, is the test of mental capacity required of the testator.' *Huffaker* v. *Beers,* 95 Ark. 158, 128 S. W. 1040; *Emerich* v. *Arendt,* 179 Ark. 186, 14 S. W. 2d 547," and in one of our early cases on the subject, *McCulloch* v. *Campbell,* 49 Ark. 367, 5 S. W. 690, this court held: (Headnote 2) "The infirmities of age and even a partial eclipse of the mind, will not prevent a person from making a valid testament if he can retain in his memory, without prompting, the extent and condition of his property, and understands to whom he is giving it and is capable of appreciating the relations to him and merits of others whom he excludes from any participation in his estate," and on the question of undue influence, (Headnote 1) "The undue influence which avoids a will is not the influence

which springs from natural affection, or is acquired by
kind offices, but it is such as results from fear, coercion,
or any other cause that deprives the testator of his free
agency in the disposition of his property. And it must
be directly connected with the execution of the will and
specially directed towards the object of procuring a will
in favor of particular parties.''

See, also, *Taylor.* v. *McClintock*, 87 Ark. 243, 112 S.
W. 405, wherein this court said: ''Testators are not re-
quired by law to mete out equal and exact justice to all
expectant relations in the disposition of their estates by
will, and the motives of partiality, affection or resent-
ment, by which they naturally may be influenced, are not
subject to examination and review by the courts. *Barrick-
low* v. *Stewart*, 163 Ind. 438, 72 N. E. 128; *Clapp* v. *Fuller-
ton*, 34 N. Y. 190, 90 Am. Dec. 681. If one has the capac-
ity indicated to make a will then he may make it as 'eccen-
tric, injudicious and unjust as caprice, frivolity or re-
venge can dictate.' *Schneider* v. *Vosburgh*, 143 Mich. 476,
106 N. W. 1129; In re *Spencer's Estate*, 96 Cal. 448, 31
Pac. 453; *Rivard* v. *Rivard*, 109 Mich. 98, 66 N. W. 681.''

There was other testimony that tended to show that
an estrangement had grown up between appellant and his
deceased sister, and indifference and neglect on appel-
lant's part. Many facts and circumstances may be con-
sidered in determining whether the deceased at the time
she made her will was conscious of the ''deserts and
claims'' which her relatives had upon her. No hard and
fast rule may be employed. In this connection, the testa-
tor may take into account, when considering his duties to
relatives, past neglect, indifference, estrangement, and
the like. Appellant's contention that because he loaned
the deceased the money with which to buy a part of her
property, he had a claim upon her bounty affords him
little comfort in view of the uncertain and indefinite
nature of his testimony. It will be noted that he made
no attempt to explain just how or when the purported
loan was made, or the circumstances or conditions sur-
rounding it. He did not say that he ever demanded re-
payment. In this connection, the following colloquy that

took place during the examination of Dr. Bremyer is noteworthy. Q. (Mr. Coulter, continuing) I didn't say there was any obligation against the property; I say if it should be true that the brother (appellant) had given her the money to purchase that property and then she left him out—Court: And I think it would be open to objection if you asked a psychiatrist. Her brother might have given her the money 20 years before, or they might have had estrangements, or he might have told her he didn't want it back or —

Having reached the conclusion that the preponderance of the testimony supports the decree, it is affirmed.