SIMPSON *v.* BURGE.

4-8994                                    224 S. W. 2d 830

Opinion delivered November 21, 1949.

Rehearing denied December 19, 1949.

R. W. *Tucker*, for appellant.

J. J. *McCaleb* and W. D. *Murphy, Jr.*, for appellee.

DUNAWAY, J. Whether Folz H. Simpson possessed testamentary capacity at the time of execution of a purported will, is the issue in this case. The Independence Probate Court found that he did not, and denied probate of the will. From that order comes this appeal.

Simpson died in Independence County on July 4, 1948, after an illness which had lasted from the time of a stroke he suffered on or about May 12, 1945. He was survived by a daughter, the contestant of the will—appellee, here; and by a son, contestee and appellant. The will in question was executed in the evening of December 4, 1945, at decedent's home where he lived with his son. The instrument was prepared by a Batesville attorney at the request of decedent's son, who came to his office and told him the disposition of property desired by the elder Simpson. One hundred dollars was to be bequeathed the daughter, and the balance of the estate, valued according to the testimony at from $20,000 to $25,000, was to go to the son. Some time in the evening of December 4, 1945, the attorney who was employed and paid by the son went to decedent's home. Since decedent was unable to write, because of his illness, he made his mark on the instrument which had been read or explained to him by the attorney. The attorney witnessed his mark, and two attesting witnesses subscribed their signatures to the document. All three testified that decedent could not carry on a conversation, and that he declared this to be his will by

nodded or grunted assents to the attorney's questions. The purported will was then sealed in an envelope and given to the son, who took it the next day to the office of the Probate Clerk of Independence County, where it remained until after the death of Folz Simpson.

These facts are undisputed. The rest of the testimony as to the decedent's condition of health and mental capacity from the time of his disabling stroke in 1945 until his death in 1948, is in hopeless conflict. To detail the statements of all the witnesses would serve no purpose.

Generally, the witnesses for the contestant testified that decedent had been mentally incompetent continuously from May 12, 1945, until he died, that he did not recognize them when he was visited, that he could not talk. One impressive part of contestant's case was the testimony of a friend of the son, who when requested to come to the house to witness the elder Simpson's will, refused to do so because he did not think the father had the required mental capacity. He had known decedent for years and saw him frequently just prior to the execution of the will.

Against this testimony, many witnesses appeared for contestee to state that they had seen decedent during his illness, and that in their opinion he was competent. Most of them reached this conclusion on the basis of brief conversations had with him from time to time. Almost all admitted he could not talk and carry on a conversation, but could make them understand such things as whether the son was on the farm or had gone to town. The testimony as to decedent's knowledge of his affairs and his relationships was limited to this.

Most significant was the testimony of the attorney who prepared the will. On cross-examination, after describing the circumstances attending decedent's signing his mark to the will, he made these statements, ". . . he was not able to discuss it with his faculties like they were." "Nothing was said there to indicate to me whether he was competent or incompetent." Then after

stating that he would have brought a doctor along had he known in advance decedent's condition, the attorney gave this answer to a question of whether decedent knew the contents of the will and knew what he was doing: "I would not say that he did or that he did not, that is, I would not say that he didn't know either." . . . "I can say that he knew he was making his mark, but now as to whether he knew what he was making his mark for I could not say."

Contestant, of course, had the burden of showing that a will executed with due formalities and properly proved was in fact executed by a person lacking in testamentary capacity. *Gray* v. *Fulton,* 205 Ark. 675, 170 S. W. 2d 384; *Parette* v. *Ivey,* 209 Ark. 364, 190 S. W. 2d 441. Our authorities on what constitutes testamentary capacity—ability on part of testator to retain in memory without prompting the extent and condition of his property; to comprehend to whom he is giving it; and to appreciate the deserts and relations to him of those whom he excludes from his will—are fully discussed in earlier cases. See *Pernot* v. *King,* 194 Ark. 896, 110 S. W. 2d 539; *Shippen* v. *Shippen,* 213 Ark. 517, 211 S. W. 2d 433. The applicable law is clear.

Appellant's allegations of errors on the part of the trial judge as to admissibility of evidence on the main issue have all been carefully considered. Unless from the competent evidence in the record it appears that the finding of the probate court is contrary to the preponderance of the testimony, the judgment below should be affirmed. *Boyland* v. *Boyland,* 211 Ark. 925, 203 S. W. 2d 192. We cannot say that the preponderance of the evidence does not support the finding of testamentary incapacity.

Affirmed.