Ida HILER, Mrs. S. P. BLACK, Etta SEARLEY, BARTON DECK, PAUL E. SARVER AND BARBARA SARVER v. Archie CUDE as Executor of Estate of Rose N. Gordon, deceased, and as Intervenor

5-4970                                    455 S. W. 2d 891

Opinion delivered June 15, 1970
[Rehearing denied August 3, 1970.]

*Shaw & Shaw,* for appellants.

*Joe Hardegree,* for appellee.

JAMES E. HYATT, JR., Special Justice. This is a Will contest and comes here on appeal from the Order of the Polk County Probate Court admitting to probate the Will of Rose N. Gordon, dated January 7, 1968, and the codicil thereto dated January 23, 1968, (hereinafter called Will 2) offered for Probate by the Appellee, and dismissing the Appellants' objections to and contest of that Will and their offer to probate an earlier Will dated October 3, 1967, (hereinafter called Will 1).

The undisputed facts are: Rose N. Gordon, a 72 year old widow, who lived a more or less secluded life on her 80 acre farm in Polk County, Arkansas, following the death of her husband in 1965, died testate on March 17, 1968. She had no children, but was survived by three sisters, a brother and a niece, all of whom were non-residents and with whom she had had little or no association for the past twenty or thirty years. She was also survived by a 40 year old foster son, whom she never adopted, Paul E. Sarver, sometimes referred to as Earnest E. Sarver, who was in the Navy stationed in California, with his wife and four children. At the time of her death the decedent owned an 80 acre farm in Polk County on which she lived (which she and her husband had acquired in 1956), the household furnishings situated therein, certain cattle, farm machinery and motor vehicles, shares of stock in various corporations and cash on deposit in a bank.

Mrs. Gordon, in the approximately 5 months preceding her death, made two different Wills and a Codicil to the latter, each of which was prepared by a highly respected member of the Bar. The first Will, which we shall call Will 1, was dated October 3, 1967, and was prepared by Mr. Nabors Shaw, the family attorney since 1956, at his office at Mena, Arkansas, and was duly executed there by Mrs. Gordon and attested as required by law, and left in the attorney's vault for safekeeping. Under this Will, Mrs. Gordon devised and bequeathed her entire estate to the foster son Paul E. Sarver and his wife for their lives, and then on their death, to this couple's four children in fee simple, naming a local banker as Executor.

This Will remained in the attorney's office five or six weeks until the middle of November 1967, when Mrs. Gordon sent for it and had it brought to her home. Upon receiving it, she read it before the people present, then tore the Will proper from the attesting Affidavit and handed it to one of the persons present asking him to put it on the fire to burn in the fireplace in front of which she was sitting, which he did. The

Will was burned at her direction and she retained only the Affidavit.

The second Will, which, together with the Codicil thereto hereinafter mentioned dated January 23, 1968, we shall call Will 2, was made approximately six weeks after Will 1 was burned and dated January 7, 1968. This Will was prepared by Mr. Max Witt, an attorney of Mount Ida, for whom she had sent, in the home of Mrs. Gordon on that date, a Sunday, and was duly executed there by Mrs. Gordon and attested as required by law. Later a Codicil to this Will was prepared by Mr. Witt at his office and sent to Mrs. Gordon on January 23, 1968, at the Mena Hospital, where she was then a patient, where it was executed by Mrs. Gordon and attested as required by law.

Under this Will, which contained a standard revocation clause, and the Codicil thereto, Mrs. Gordon bequeathed her household furnishings, cattle, farm machinery and motor vehicles, except one car, which she left her Executor, to Clark Cude and Wayne Cude, two neighboring teenage boys, to whom she had previously deeded her 80 acre farm (in which deed she had reserved unto herself a life estate), the sons of a friend and neighbor who had assisted or worked for her about her farm during the last several years of her and her husband's life, and who had assisted in caring for her during the last months of her life. She disposed of the remainder of her property by specific bequests of a baby grand piano to a niece, Margaret Stimsman; 100 shares of common stock in the Polk County Farmers Association to the Seventh Day Adventist Church in Hutchinson, Kansas; 318 shares of stock in the El Paso Electric Company to the Salvation Army in El Paso, Texas; 120 shares of stock in the El Paso Natural Gas Company to a sister, Anna Black of Teague, Texas; and the cash on deposit in the bank to her Executor to pay the taxes and farming expenses on the farm which she had previously deeded to Clark Cude and Wayne Cude.

In Will 2, which not only revoked all 'prior Wills, Mrs. Gordon specifically excluded the foster son, to whom she had devised and bequeathed her entire estate in Will 1, by the following provision, and we quote:

> "*Eight*: I have helped raise a boy, EARNEST E. SARVER, and he has already been provided for, and IT IS MY WILL, AND I EXPRESSLY STATE THAT EARNEST E. SARVER RECEIVED ABSOLUTELY NOTHING, FROM MY ESTATE OR PROPERTY."

She named Archie Cude, a neighbor and the father of Clark and Wayne Cude, the principal beneficiaries under Will 2 and the persons to whom she had deeded her farm, as Executor of her estate without bond, and provided that in the event that he was unable to serve as such Executor, that her attorney, Max Witt, was to serve as Executor without bond.

Upon Mrs. Gordon's death on March 17, 1968, Archie Cude, as the person nominated as Executor in Will 2, filed and offered for Probate Will 2 (the Will dated January 7, 1968, and the Codicil thereto dated January 23, 1968) together with the required proofs of attesting witnesses, with the request that he be appointed Executor of Mrs. Gordon's estate as directed by said Will. Mr. Cude also filed a separate intervention requesting the Probate of Will 2 and the denial of the Petition for the Appointment of a Successor Guardian to administer Mrs. Gordon's estate filed by John W. Gordon and Earnest E. Sarver (which said Petition does not appear in the record).

The three sisters and brother of Mrs. Gordon, the foster son and his wife and four children, contestants below and Appellants herein, filed objections to the Probate of the proffered Will dated January 7, 1968, and Codicil thereto dated January 23, 1968, contesting mainly on three grounds: that Mrs. Gordon was mentally and physically incapable and unduly influenced by Archie Cude to make a new Will and in attempting to

revoke the Will which she had made on October 3, 1967; that Mrs. Gordon was mentally and physically incapable of making either the October 3, 1967, Will, or the January 7, 1968, Will and the Codicil thereto, and that the Court should make a determination that she died intestate; and that the proponents of Will 2 exercised undue influence over the Testatrix and fraudulently and deceitfully obtained the execution of Will 2 and deprived Testatrix of the assets of her estate.

The contestants (Appellants) urged the probate Court to refuse to Probate the January 7, 1968, Will and Codicil thereto dated January 23, 1968, by reason thereof and make a finding that the decedent was mentally and physically incapable and unduly influenced in attempting to revoke the Will which she had made on October 3, 1967, and, in the event the Court determined that the deceased was mentally and physically incapable of making either the October 3, 1967, or January 7, 1968, Will and the Codicil thereto, make a finding that the deceased died intestate; and for attorney fees, etc.

After an extensive hearing thereon consisting of the oral testimony of 25 witnesses, with exhibits, the deposition of 1 witness, numerous exhibits and the excellent Trial Briefs by Counsel for both sides, the Probate Court rendered its Order and Judgment admitting to Probate Will 2, the Will dated January 7, 1968, and the Codicil thereto dated January 23, 1968; found that the objections raised and relief asked for by the contestants to the Probate of that Will and Codicil should be and were denied and dismissed; appointed Archie Cude, the party nominated in the January 7, 1968, Will, Executor and directed the Clerk to issue Letters Testamentary to him.

From that Order comes this appeal.

For reversal, Appellants contend that the lower Court's finding (1) that decedent did not lack testamentary capacity at the time she executed the Will and

Codicil thereto is not supported by a preponderance of the evidence; (2) that the decedent executed the Will and Codicil thereto of her own free will and act and not as a result of coercion, fraud or undue influence is not supported by a preponderance of the evidence; and (3) the Court erred in failing to recognize that the burden of proof shifts from will contestants to the will proponents where the proponent procures the making of the Will, and that then the proponent must show beyond a reasonable doubt that testatrix had both such mental capacity and such freedom of will and action as are requisite to render a valid will.

We cannot agree with counsel for Appellants in these contentions. Simply stated, the issues raised are (1) the rule of this Court on de novo hearings on appeal, (2) mental or testamentary capacity to revoke or make a will, (3) undue influence, and (4) burden of proof in will contest cases.

General Testimony: Mrs. Gordon lived alone on her farm after her husband's death with her cattle, numerous birds and cats, and operated it herself with the help of friends and neighbors. She was a strong willed person, with certain peculiarities. From 1962, after an operation, to November 1967, she had a friend and companion named Alice Ferguson, who normally drove her. She had little or no contact with her sisters and brother, and had been visited by the foster son only five times since she came to Arkansas in 1956 to the time of her death in 1968.

In the fall of 1967, Dr. Calvin Austin discovered she had advanced caricnoma of the rectum, without hope of cure. When she learned of this, she sent for the foster son to come to Arkansas and visit with her, and after he arrived explained her situation to him and attempted to persuade him to come live with her, but he did not choose to do so.

On October 3, 1967, she and the foster son went to her family lawyer where she made Will 1 leaving

all of her property to the foster son and his wife and children. She left the Will and other papers with the attorney for safe keeping. After that the son returned to California.

Surgery was recommended for Mrs. Gordon by Dr. John Wood, and on October 17, 1967, she entered the Mena Hospital, where Dr. Wood performed a colostomy. During this time the foster son and his wife came back to Arkansas to be with her, at which time they stayed on the Gordon farm.

When the foster son was home and Mrs. Gordon in the hospital, she requested he bring her a package from the home which she contended contained money. When the package was delivered to her she contended some $1,500.00 or $1,600.00 Dollars supposedly in the package was missing from it, and accused the foster son of taking it. Some silverware, a violin and furs also were alleged to have disappeared from the home. This was extremely vexing to Mrs. Gordon and caused her to be distrustful of the foster son.

After the operation in October, Dr. Wood recommended that Mrs. Gordon go to a nursing home until she could adjust to the colostomy and care for herself. At first Mrs. Gordon accepted the idea, but later rebelled. The surgeon recommended that a guardian be appointed for her to look after her affairs and place her in a nursing home. Unknown to her, the foster son went to the family lawyer, who had prepared Will 1, and had him prepare a Petition to have Mr. Crowell the Executor named in Will 1, appointed guardian for Mrs. Gordon so she could be placed in a nursing home.

Mrs. Gordon was served with notice of the application for appointment of a guardian for her in the hospital and without prior notice. She became infuriated at the foster son, the family lawyer and the nominated guardian and suspicious of all connected therewith, as all being a conspiracy against her to get her

in a nursing home. She from that point until her death was distrustful of those named, stating she was not going to a nursing home, but wanted to return to die with her birds and cats in her own home.

Archie Cude, a friend and neighbor for a number of years, whose wife was in the hospital at the same time, with his wife visited Mrs. Gordon at this time. Mrs. Gordon expressed to him her fear and apprehension of the action taken by the foster son and the others and told him of her desire to go home rather than to a rest home. She was very upset. She asked him to see what he could do to help her. The hearing was to be the next day and she was upset about that as well as the missing money. Cude contacted the lawyer to get him to postpone the hearing for a week until she could do something, and it was put off indefinitely. Mr. Mc-Millan also intervened in her behalf. When Alice Ferguson refused to help her, Cude offered to look after her and her property and help her until she could get someone or hire somebody. Mrs. Gordon's attitude towards the foster son, doctor, lawyer and Alice Ferguson changed from that point on. After this Cude and his family helped Mrs. Gordon with them doing the physical work and her making the decisions and managing things.

Mrs. Gordon remained in the hospital until November 4, 1967, during which time Charlie McMillan, a close friend and fellow church member of Mrs. Gordon, at her request, obtained from the proposed guardian all the papers given him by the foster son after the Petition for his appointment as her guardian was filed and also her first Will (Will 1) from the attorney who was holding it and delivered them to Mrs. Gordon.

After Mrs. Gordon returned home and received the papers from the proposed guardian and the first Will, she burned the Will in the presence of witnesses stating that she was through with it, but retained the Affidavit as that was the first attorney's opinion that she was competent. She then wrote notes to and called several

attorneys outside of Mena, stating she wanted one totally unconnected with her former friends, to get their assistance in making a new Will and disposing of her property.

After several unsuccessful attempts to obtain a lawyer who could come to her home, she finally sent a note by Archie Cude to Max Witt at Mount Ida, who with his wife drove to Mrs. Gordon's home one Sunday, where, on January 7, 1968, he prepared Will 2, and a Warranty Deed conveying the farm to Clark and Wayne Cude, the minor sons of Archie Cude, retaining a life estate unto herself, both of which were executed as required by law. The Deed was recorded January 8, 1968. On January 22, 1968, Max Witt, at the written directions of Mrs. Gordon, prepared a Power of Attorney authorizing Archie Cude, her nominated Executor in Will 2 and the father of Clark and Wayne Cude, to manage her property and affairs and another Warranty Deed of the farm to the Cude boys to correct and make clear her intent in the January 7th deed, both of which were duly executed and acknowledged as required by law and then recorded.

It would unduly burden this opinion to further detail the testimony and would serve no useful purpose, but briefly stated contestants offered proof that Mrs. Gordon was competent when she made Will 1, but that when she attempted to revoke it by burning it five or six weeks later she was incompetent due to mental incapacity and the undue influence of Archie Cude, who they further contend was a beneficiary and the procurer of the making of Will 2.

The proponents offer the testimony of twelve (12) witnesses including the attorney who prepared Will 2 and his wife and the attesting witnesses to both the will and codicil, each of whom clearly and unequivocally testify as to the normalcy of the facts and circumstances surrounding Mrs. Gordon at the time she dictated the terms to be inserted in her Will, and executed it, and the deed, as well as at the time the Codicil,

Power of Attorney and new deed were made and to the complete competency to make a will under the rules followed by this Court as hereinafter set out, as well as to the absence of fraud or undue influence on the part of Cude. Even Mrs. Gordon's regular physician, called by contestants, testifies that in his opinion she was competent, although he does question her business judgment.

The contestants offer the testimony of ten (10) witnesses including that of the beneficiaries under Will 1 and the Deposition of a sister, all of whom had become more or less alienated from Mrs. Gordon, either by their long period of absence from her or because of what Mrs. Gordon felt their actions towards her warranted. Little of this testimony bore directly upon the mental condition of Mrs. Gordon at the date and time of the execution of the Will, Codicil, Power of Attorney and Deeds, or immediately before and after that date and time so as to be persuasive. Some testimony is offered to try to establish a relationship and plot on the part of Archie Cude to Mrs. Gordon to raise a presumption of fraud and undue influence, but there is no positive testimony on these points and that offered is not persuasive or convincing.

After carefully weighing and analyzing all of the testimony presented in this record (834) pages) and the excellent briefs of counsel and opinion of the Trial Judge, who had an opportunity to personally observe and weigh the testimony of each witness and thus was in a better position than this Court to determine the weight to be given such testimony, we think the clear preponderance of the testimony supports the finding and Order of the Trial Judge.

The rules of law applicable to the contentions and subjects in this case, and which guide us in reaching a decision herein are set out in the following separate headings.

FIRST—TRIAL DE NOVO.

▉▉▉▉▉▉▉▉▉▉▉

The rule is well established that will contest cases on appeal come before this Court for trial de novo, and unless this Court can say that the Order of the lower Court is NOT supported by a preponderance of the testimony, it will be the duty of this Court to affirm. *Welch* v. *Farber* 188 Ark. 696, *Parette* v. *Ivey,* 209 Ark. 364, 190 S. W. 2d 441, *Thiel, Special Administrator,* v. *Morley,* 223 Ark. 175, 265 S. W. 2d 507, *Sullivant* v. *Sullivant,* 236 Ark. 95, 364 S. W. 2d 655, *Short* v. *Stephenson,* 238 Ark. 1048, 386 S. W. 2d 501.

## SECOND—MENTAL OR TESTAMENTARY CAPACITY

Mental or testamentary capacity as must be possessed by a testator in order for him to make a valid will has been defined by this Court many times in two lines of cases, which are:

The rule has been generally expressed that sound mind and disposing memory, constituting testamentary capacity, is (a) the ability on the part of the testator to retain in memory without prompting the extent and condition of property to be disposed of; (b) to comprehend to whom he is giving it; and (c) to realize the deserts and relations to him of those whom he excludes from his will. *Taylor* v. *McClintock,* 87 Ark. 243, 112 S. W. 405; *Boone* v. *Boone,* 114 Ark. 69, 169 S. W. 779; *Mason* v. *Bowen,* 122 Ark. 407, 183 S. W. 973, Ann. Cas. 1917D, 713; *Griffin* v. *Union Trust Company,* 166 Ark. 347, 266 S. W. 289; *Puryear* v. *Puryear,* 192 Ark. 692, 94 S. W. 2d 695; *Petree* v. *Petree,* 211 Ark. 654, 201 S. W. 2d 1009.

Testamentary capacity means that the testator must be able to retain in his mind, without prompting, the extent and condition of his property, to comprehend to whom he is giving it, and relations of those entitled to his bounty. *Tatum* v. *Chandler,* 229 Ark. 864, 319 S. W. 2d 513; *Sullivant* v. *Sullivant,* 236 Ark. 95, 364 S. W. 2d 665; *O'Dell* v. *Newton,* 228 Ark. 1069, 312 S. W. 2d 339.

Complete sanity in a medical sense is not essential to testamentary capacity, provided power to think rationally exists when a will is made.

A will executed in a lucid interval is valid. Thus, the time to be looked into in determining a testator's mental capacity to make a will is when the document was executed. In dealing with this subject, this Court in *Scott* v. *Dodson, Executor,* 214 Ark. 1, 214 S. W. 2d 357, said:

> "Fifth—The Applicable Law.—The test is whether Mrs. Boykin, on September 13, 1938, had a fair comprehension of the nature and extent of her property, of her relationship to those who had claims upon her, of their situation as it affects financial need, or financial sufficiency; and of other obligations existing at the time she acted.
>
> Complete sanity, in a medical sense, is not essential; provided, that the power to think rationally exists when the individual's will to act is exercised. The word 'will' of itself connotes purpose, intent, deliberation, violation, freedom from unreasonable restraint, voluntariness, desire, the power to choose, discretion."

In 56 Am. Jr., page 89, under subject of "WILLS" and under the sub-head of "Lucid Intervals" it is stated: which is quoted with approval in *Thiel, Special Adm'r* v. *Mobley,* 223 Ark. 167, 265 S. W. 2d 507, "A will executed in a lucid interval by one who was before and after a confirmed lunatic is valid. ." The following section, also in point here, states that "The time to be looked to in determining the capacity of a testator to make a will, in reference to his mentality, is the time when the will was executed". See also *Puryear* v. *Puryear,* 192 Ark. 692, 94 S. W. 2d 695.

The same degree of mental capacity is necessary to revoke a will as to make one.

Revocability is an essential characteristic of a will. Except where a testator subsequently becomes incompetent, he retains the power of revocation as long as he lives. Thus the same test of mental capacity applies to the revoking of a will as to the making thereof. See 57 Am. Jur. 458, Wills, page 322.

We adhere to these rules and find that the lower Court's finding of competency of the decedent at the time of the revocation of Will 1 and execution of Will 2 is supported by a preponderance of the evidence.

All of the witnesses for the proponents testified to facts, according to these rules, which established the competency of the decedent at the time she made the Will and other documents. Witnesses for contestants testified that in their opinion she was not able to make a will, but did not testify to facts or acts which supported their opinion. True she may have had peculiarities or eccentricities, but these are not sufficient to indicate mental incapacity.

As heretofore stated, we have examined the entire record and have reached the conclusion that the Order is supported by a preponderance of the evidence, and, therefore, the Order should not under this rule be disturbed.

## THIRD—FRAUD AND UNDUE INFLUENCE.

The fraud and undue influence which the law condemns as voiding a will is defined by this Court in *Thiel, Special Adm'r v. Mobley, supra,* when it quoted with approval from *Puryear v. Puryear,* 192 Ark. 692, 94 S. W. 2d 695:

" 'As we understand the rule, the fraud and undue influence which is required to void a will must be directly connected with its execution. The influence which the law condemns is not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coer-

cion, or any other cause which deprives the testator of his free agency in the disposition of his property. And the influence must be specifically directed toward the object of procuring a will in favor of particular parties. It is not sufficient that the testator was influenced by the beneficiaries in the ordinary affairs of life, or that he was surrounded by them and in confidential relation with them at the time of its execution' ''.

See also also *McCulloch* v. *Campbell,* 49 Ark. 367, 5 S. W. 590, and *Orr* v. *Love,* 225 Ark. 505, 283 S. W. 2d 667.

The charge of fraud and undue influence is based primarily upon the fact Mrs. Gordon revoked her Will of October 3, 1967, in which she left all of her property to a foster son and his family and by deed and her Will of January 7, 1968, deeded or devised all of that property to her neighbors, Archie Cude and his sons.

It is evident from the testimony that after the episode in which the foster son sought to have a guardian appointed for Mrs. Gordon and the subject of the missing money and other articles from the home, Mrs. Gordon became estranged from the foster son and alienated from his family and sought new friends for help and solace, the Cudes. The Cudes cared for Mrs. Gordon and apparently abided by her wishes with respect to seeing to her health and physical needs as well as looking after and managing her property.

The rule in this State has been for many years that so long as a testator has the required capacity to make a will he may leave his property to whom he chooses no matter how capricious or frivolous it may seem to others.

In *Parette* v. *Ivey, Executor,* 209 Ark. 364, 190 S. W. 2d 441, this Court said,

"The undue influence which avoids a will is not

the influence which springs from natural affection, or is acquired by kind offices, but it is such as results from fear, coercion, or any other cause that deprives the testator of his free agency in the disposition of is property. And it must be directly connected with the execution of the will and specially directed towards the object of procuring a will in favor of particular parties.

"See, also, *Taylor* v. *McClintock*, 87 Ark. 243, 112 S. W. 405, wherein this court said: 'Testators are not required by law to mete out equal and exact justice to all expectant relations in the disposition of their estates by will, and the motives of partiality, affection or resentment, by which they naturally may be influenced, are not subject to examination and review by the Courts. *Barricklow* v. *Stewart*, 163 Ind. 438, 72 N. E. 128; *Clapp* v. *Fullerton*, 34 N. Y. 190, 90 Am. Dec. 681. If one has the capacity indicated to make a will then he may make it as eccentric, injudicious and unjust as caprice, frivolity or revenge can dictate. *Schneider* v. *Vosburgh, 143 Mich. 476, 106 N. W. 1129; In re Spencer's Estate,* 96 Cal. 448, 31 Pac. 453; *Rivard* v. *Rivard,* 109 Mich. 98, 66 N. W. 681.

"There was other testimony that tended to show that an estrangement had grown up between appellant and his deceased sister, and indifference and neglect on appellant's part. Many facts and circumstances may be considered in determining- whether the deceased at the time she made her will was conscious of the 'deserts and claims' which her relatives had upon her. No hard and fast rule may be employed. In - this connection, the testator may take into account, when considering his duties to relatives, past neglect, indifference, estrangement, and the like."

The testimony does not support the contention that Archie Cude held a confidential relationship with Mrs. Gordon at the time of the execution of the Will and other documents, or that he was a beneficiary thereunder within the meaning of these rules, but shows that he was her helper, messenger or benefactor.

## FOURTH: BURDEN OF PROOF.

It is well established in this State that the burden of proving mental incompetency, undue influence or fraud which will defeat a will is on the party contesting it: *Werbe v.Holt*, 218 Ark. 476, 237 S. W. 2d 478; *Walsh* v. *Fairhead*, 215 Ark. 218, 219 S. W. 2d 941; *McWilliams* v. *Neill*, 202 Ark. 1087, 155 S. W. 2d 344; *Smith* v. *Boswell*, 93 Ark. 66, 124 S. W. 264; *Thiel, Special Adm'r* v. *Mobley*, 223 Ark. 265, *McDaniel* v. *Crosby et al*, 19 Ark. 533, *Sullivant* v. *Sullivant*, 236 Ark. 95, 364 S. W. 2d 665.

And just as in *Sullivant* v. *Sullivant, supra,* the appellants in this case, attempt to shift the burden of proof to the proponents (appellee) of the Will 2 by relying on the rule in *Orr* v. *Love*, 225 Ark. 505, 283 S. W. 2d 667, where this Court said:

"When it is shown that the will is drawn or procured by a beneficiary, there is a presumption of undue influence. It is incumbent on those, who, in such a case, seek to establish the will, to show beyond reasonable doubt, that the testator had both such mental capacity, and such freedom of will and action, as are requisite to render a will legally valid."

In that case the testatrix made four wills in less than a month. The proponent of the last will, the daughter-in-law, was one of the principal beneficiaries who had her own lawyer prepare the will according to her individual instructions and contrary to the terms of the first will.

In the case at bar, Mrs. Gordon dictated to the attorney the terms she wanted in her will, specified that certain property and stocks go to particular beneficiaries and dictated the terms of a deed, a clear reading of which in itself shows the decedent to have the capacity to retain in her mind without prompting the extent and condition of her property and to comprehend to whom she is giving it, and that the only part Archie Cude played in this was acting as her messenger. The

testimony does not show him to be the procurer or beneficiary so as to raise a presumption of undue influence.

Appellants also contend that under the *Orr* rule, not only did the burden of proof shift to the proponent but also that the proponent must prove *beyond reasonable doubt* that the testatrix had both such mental capacity, and such freedom of will and action, as are requisite to render a will legally valid.

We do not agree with Appellants in either contention.

We adhere to the rule that the burden of proving mental incompetency, undue influence and fraud which will defeat a will is upon the party contesting it. We hold this burden, in the sense of the ultimate risk of nonpersuasion, never shifts from the contestant. This does not however, conflict with the rule concerning the burden of going forward with the evidence or burden of evidence. As stated in 29 Am. Jur. 2d, 156, Evidence Section 125: "In short, the burden of proof, in the sense of the ultimate risk of nonpersuasion, never shifts from the party who has the affirmative of an issue, although the burden of going forward with the evidence may shift at various times during the trial from one side to the other as evidence is introduced by the respective parties."

From all of the testimony we are unable to say that the findings and Order of the Probate Court were against the preponderance and contrary to the law as herein stated.

The Order of the Probate Court is affirmed.

HARRIS, C. J., and GEORGE ROSE SMITH, J., dissent.

JONES, J., not participating.