## Curtis CHAMBERS *v.* Lucy McKNIGHT and Rosetta McDONALD

73-250                                    506 S.W. 2d 844

Opinion delivered March 25, 1974

*Baker & Pittman*, for appellant.

*Dan Felton III*, for appellees.

CARLETON HARRIS, Chief Justice. This is a will contest. Virgin Sims Nicholson, approximately 85 years of age, executed a will on March 30, 1968, leaving all of her property, consisting of certain real property, valued at over $20,000, and personal property in the approximate amount of $9,000, to her nephew, Curtis Chambers, appellant herein. Mrs. Nicholson died on September 8, 1973, survived by her sister, Rosetta McDonald, and seven nieces and nephews, including Curtis Chambers. The will was offered for probate, but Rosetta McDonald and one of the nieces, Lucy McKnight, contested the will, contending that Mrs. Nicholson was not mentally competent to make a will on March 30, 1968, and also alleging undue influence. On trial, the Lee County Probate Court agreed with the contention that Mrs. Nicholson was not mentally competent to execute the instrument and a decree was entered finding that the petition for probate of the will should be dismissed because of Mrs. Nicholson's lack of sufficient mental capacity to execute the aforementioned will. From the judgment so entered, appellant brings this appeal. For reversal, it is simply urged that the Probate Court erred in finding that Virgin Sims Nicholson lacked sufficient mental capacity to execute her Last Will and Testament dated March 30, 1968.

It might be said at the outset that this litigation is what might be termed a "close case". The record reflects that Mrs. Nicholson, formerly a school teacher, was in ill health during the last several years of her life, but the testimony is very much in conflict as to her mental capacity. Lucy McKnight testified that Mrs. Nicholson stayed with her for about two weeks in February, 1968, but did not realize the identity of Mrs. McKnight; that she did not recognize other people; she had to be reminded to use the bathroom; she would walk away from the premises; the witness had to put a lock on the outside of the door to keep her aunt inside the house; she didn't know how to put on her clothes. The witness said that

Mrs. Nicholson was not living with her husband at the time because he was in bad health himself, but that after two weeks, she called the husband and asked him to come and get his wife. Rosetta McDonald, the only sister, added but little to the testimony other than to say that she and her sister were very close and loved each other. John L. Chambers, a nephew, testified that he did not visit his aunt prior to March 30, 1968; that he visited her in 1971 and she did not know him, nor did she recognize people who were around her. He knew nothing, of course, about her condition at the time of the making of the will. Annie Mae Surgeon, operator of the Tri-State Nursing Home, testified that Mrs. Nicholson was a patient in that nursing home, being admitted in August, 1968. She said that Mrs. Nicholson's husband and step-daughter brought her to the facility, stating that they were unable to keep Mrs. Nicholson since she would wander off from home. Mrs. Surgeon testified Mrs. Nicholson was con-fused, uncooperative, did not know who brought her to the nursing home, and that she called her family and everyone in the nursing home "chickens". She said that the patient would pull off her clothes and walk down the corridors, hide her shoes in her clothing, lock herself in the room, and the witness was of the opinion that Mrs. Nicholson never knew where she was or what she was doing. She said this condition was observed from the day she was admitted until the day she was discharged. She described Mrs. Nicholson's mental status as "very bad"; she was a patient at the nursing home from August 17, 1968 until March 18, 1971. During this period of time, her husband died. She was taken from the home by appellant, who, on October 2, 1970, had been nam-ed guardian, and she lived with him until her death.

The principal witness on behalf of the contestants was Dr. George T. McPhail, a practicing physician of Forrest Ci-ty, who testified by deposition. He had known Mrs. Nicholson and her husband apparently for a long period of time and he said that she was a patient, formerly came to his office, and he had placed her in the hospital on two different occasions. The doctor said that her physical condition was such that she could have "carried on" but that primarily, "she was a mental case." He had her admitted to the hospital on January 14, 1967, and she was discharged on January 31, 1967; she was again admitted on January 16, 1968 and dis-

charged on January 27, 1968. From his testimony:

> "She had got to where Uncle Joe [her husband] couldn't handle her. She would wander off from home and Uncle Joe couldn't handle her. Uncle Joe and I were good friends. I visited in their home. He was a fine old gentleman and had all his faculties right up until he died.
>
> "She had a cardiovascular disease with generalized arteriosclerosis, gone beyond any hope of return."

The record reflects that he tried several different types of medication to help her.

> "I gave her Synalgos to try to dilate the cerebral vessels to improve her mentality but I have never seen it do a lot of good; gave massive doses of Mellaril (50 mg.) tablets to quiet her enough to even keep her in the hospital. She wandered off from the hospital on occasions and they found her down on the street."

When asked if she recognized him he said that he did not believe she knew who he was. He stated that he saw her every day and when asked to tell what he observed about her conduct and demeanor replied:

> "She was a senile, elderly colored female, who had already lived too long.
>
> She didn't know the things around her and wasn't cognizant of anything I was trying to do for her. After I discharged her from the hospital, Uncle Joe brought her up here to the Clinic until she finally got so weak he couldn't handle her and he had to put her in the nursing home. He cried. He didn't want to. I guess I have given him 1,000 Mellaril tablets to give her. He had to keep her heavily sedated."

Relative to her disease, the doctor described it as "permanent and progressive", a "degeneration of the brain". When asked if, in his opinion, she was capable of understanding on March 30, 1968, the act of making a will, whether she had sufficient

mind and memory to recall without prompting, the extent and condition of her property which was disposed of, and whether she had the mental capacity to understand her relationship to those persons affected by the will, he answered without equivocation in the negative, and was emphatic that, in his opinion, she was even in worse condition on March 30 than two months earlier when he had last observed her.

When asked on cross-examination if Mrs. Nicholson could have had a lucid interval, the doctor replied:

"No, not with her disease. Her brain had degenerated to the extent—when enough oxygen is shut off from the brain, the brain degenerates and a person becomes a vegetable, which was what she was."

He said that a lunatic can have a lucid interval but not one with the particular disease suffered by Mrs. Nicholson.

At the time of the execution of the will, Mrs. Nicholson, though married, was staying with Chambers, it appearing that her husband was a patient at the hospital in Forrest City. Appellant testified that he told his aunt he would like "the place" (meaning her property in which Curtis was living, appellant renting said property), stated that they discussed it, and she told him to contact a particular lawyer in Marianna. This he did, and the lawyer came out, talked with her about her property and desires of disposition, returned to his office and two or three days later, came back to the house accompanied by his wife, with the prepared instrument. Chambers testified that the will was explained to Mrs. Nicholson and that she understood what was being done. This elderly lady, though a former school teacher, and apprently considered as having been a capable school teacher, did not sign her name, but executed the will by mark.[1] Lando Reed, 71 years of age, who testified that he had known Mrs. Nicholson three or four years, a neighbor, witnessed the making of the mark, as did J. E. Young, who had known her for a long number of years. Both of these people testified that they saw her sign her "X" mark and it appeared that she was nervous. Young testified that the attorney explained the provisions of the will to Mrs. Nicholson, read it to her, asked if she understood, and she replied in the affirmative. Both of

[1]Appellant stated that this was because she had a sore hand.

these men testified that it was their belief that she understood what was taking place and that she was of sound mind at the time. The lawyer, since deceased, and his wife, also signed the instrument as witnesses. The attorney's spouse testified that her husband had represented Virgin for about twenty years, and that she had known the testatrix for many years. She said that her husband read the will, asked Mrs. Nicholson if she understood, and received an affirmative reply; that Mrs. Nicholson recognized her when she came into the house and spoke to her. It was her opinion that the testatrix was of sound and disposing mind and memory at the time of the execution of the will. She said that Mrs. Nicholson seemed perfectly normal for a person of her age, although it was obvious that she was ill.

Dr. Bernard Capes, a physician of West Helena, testified on behalf of appellant by deposition, and in answer to a long, hypothetical question, embracing the testimony that had been offered, stated that in his opinion Mrs. Nicholson *could* have been mentally competent to execute the will on March 30, 1968. He said that arteriosclerotic senility is a type of mental, disease, but it does not mean that a person cannot have lucid moments and he commented that his idea of a "vegetable" and that of Dr. McPhail might be different, although he agreed that if a disease reaches a point where someone could properly be so classified, the condition, of course, would be permanent. Dr. Capes did comment that since Dr. McPhail had treated the patient for many years, particularly during her 1967 and 1968 admissions to the hospital, and was accordingly in a position to observe her conduct through actual observation, Dr. McPhail's medical opinion should be given great weight.

As earlier stated, this is a close case and the facts are such that whatever the probate judge decided, it would be difficult to say that his findings were against the preponderance of the evidence. It is apparent from his opinion that great weight was accorded the testimony of Dr. McPhail, the court stating:

"The Court is impressed with the medical testimony of Dr. McPhail. He was the family physician, and had known this woman, and her husband, for years. His acquaintance was not limited to the two periods of

hospitalization. He had seen her condition coming on for quite a while. He was positive that she had '. . . . gone beyond any hope of return.' She was last seen by Dr. McPhail in January, 1968. The doctor was of the opinion that she was 'even worse (in March, when the will was executed) than she was the last time I had seen her.' Dr. McPhail further testified on cross examination that in his opinion she could not have had a 'lucid interval' during which she would have been competent to execute a will.

Although there is the medical testimony of Dr. Capes, it is not based on first-hand knowledge; but rather upon a hypothetical question."

The court then commented that in making its findings, it did not discredit the testimony of the witnesses to the will, but it was observed that those witnesses only saw the decedent briefly; further, that the will was executed in the home of the appellant with then then living husband of Mrs. Nicholson not present; that appellant had told Mrs. Nicholson that he wanted "the place" and had mentioned to her the matter of whether she should make a will. It was recognized that appellant Chambers had looked after Mrs. Nicholson for a good part of her last illness but "the beneficiary knew that the will had been executed, and human nature being what it is, would have an incentive to act as he did."

We have many times said that in will contest cases, unless we can say that the order of the trial court is not supported by a preponderance of the testimony, it is the duty of this court to affirm. See *Hiler* v. *Cude, Executor*, 248 Ark. 1065, 455 S.W. 2d 891, and cases cited therein. We cannot say that the findings of the trial court are not supported by a preponderance of the evidence.

Affirmed.