2010 Ark. App. 149

**HEIRS OF F.D. GOZA, Jr.,
et al., Appellants**

v.

**ESTATE OF William E. POTTS,
Deceased, Appellee.**

**No. CA 09–235.**

Court of Appeals of Arkansas.

Feb. 17, 2010.

Rehearing Denied March 31, 2010.

J. Shawn Spencer, Shawnee, OK, Carl A. Crow, Jr., John William Crow, Hot Springs, Phyllis J. Lemons, Malvern, for appellants.

George E. Hopkins, Malvern, Bret D. Watson, Anderson, Murphym Hopkins, L.L.P., Little Rock, Sherry Burnett, Malvern, for appellees.

JOHN MAUZY PITTMAN, Judge.

This is a probate case in which the former in-laws of the decedent, William "Bill" Potts, are attempting to take their shares as beneficiaries of a 1989 will, which, the estate asserts, was revoked between 2002 and Bill's death in 2006. Appellants, relatives of Bill's deceased wife, Wanda Goza, attempted to prove that Bill lacked testamentary capacity and suffered under some insane delusions when he revoked his will. The trial court held that the will was revoked and that Bill died intestate. We affirm.

Bill married Wanda in 1945. They had no children and lived in California until she died in August 2002. Wanda's sister, Wilda, married appellant Glenville Rhodes. Wilda and Wanda had two brothers, F.D. Goza, Jr., and appellant Paul Goza. F.D. Goza, Jr., had three children, appellants David Goza, Gary Goza, and Sharon Wheeler. In 1989, Bill signed a will leaving his estate to Wanda and named Paul, F.D. Goza, Jr., and Wilda as contingent beneficiaries. F.D. Goza, Jr., died later that year. Wilda died in 2001. Bill and Wanda often visited their relatives in Malvern. They bought a house there in 1991, where they stayed during their visits. Paul helped them maintain the home. In 2003, Bill moved to Malvern. Before he died in October 2006, he revoked his will. He marked "void" over each paragraph; wrote "bastard" and "get nothing" on the will; and applied Liquid Paper over the names of the beneficiaries. He later shredded the document in the presence of his insurance agents, Joe Groover and ap-

pellee Rene Moreland. After he moved to Malvern, Bill became friends with Joe, Rene, and Don Rash, who operated a funeral home. After Bill's death, Don and Rene filed a petition to be appointed personal representatives and alleged that Bill had died intestate. The court appointed them co-personal representatives. Paul filed a petition to revoke their appointments and to probate the 1989 will, of which he filed a copy. Glenville also filed a petition to probate the 1989 will. The inventory filed by the personal representatives showed the value of the estate to be over $430,000.

The case went to trial on August 19 and 20, 2008. Paul, Dinah Efird (a bank employee), Zola Brandon (a bank employee), Glenville, Freddie Crownover (the mother of Glenville's son-in-law), Marsha Crownover (Glenville's daughter), Rene, Don, and Dr. Bradley Diner (a psychiatrist) testified in appellants' case-in-chief. Joe Groover, Don, and Dr. Bruce Burton (Bill's physician) testified for appellees. Appellants attempted to prove that, after Wanda died, Bill lacked testamentary capacity to revoke his will because he had suffered from insane delusions when he revoked it. The alleged insane delusions were that Paul had stolen a gold coin bracelet of Wanda's; that Wanda had sex with Glenville in September 2001, soon after Wilda died; and that Glenville had attempted to steal from Bill's bank account.

The trial court found that Bill had revoked the will and did not suffer from insane delusions when he revoked it; refused to admit the will; and ruled that Bill died intestate. The court stated:

4. Although not clear as to the date, the court finds that the decedent revoked his will sometime after his wife's death in August 2002. The will was revoked when the decedent lined out the will and by writing void, marked with

derogatory remarks and white out. All were sufficient to revoke the will pursuant to A.C.A. § 28-25-109. The Court directed a verdict on this issue. Petitioners introduced a copy of the will but the original was shredded at the offices of Joe Groover.

. . . .

11. In the case at bar, there was disputed evidence of the facts Dr. Diner relied upon to find Mr. Potts's action of revoking his will was from an insane delusion. Dr. Diner believed there was little evidence that sex occurred but more than one person was told by Mr. Potts that his wife told him she had a relationship with Rhodes. Disputed testimony of whether Mr. Goza's discussion with his sister, Wanda Potts, was overheard by Mr. Potts as to the gift of the gold coin bracelet. When the decedent was confronted by Paul Goza as to the gift, Potts dropped the subject. This mistake of fact was apparently dropped by Mr. Potts. Not one person confronted Mr. Potts' belief of infidelity of his wife and Dr. Diner himself admits if there was foundation to reach the conclusion of infidelity then no insane delusion exists.

. . . .

14. Dr. Diner admits his testimony is "educated speculation." The court finds that Dr. Diner did not take into consideration other motivational factors such as Potts' respect for his new found friends to whom he made gifts during his lifetime (Groover, Rash, Moreland).

15. The facts of this case are insufficient for the Court to find an insane delusion. In *Huffman v. Dawkins*, 273 Ark. 530 [520], 526, 622 S.W.2d 159, 162 (1981), our court has stated "if there is any basis in fact of the delusion, such a delusion will not warrant setting aside a legal document." *See also Eddleman v.*

*Estate of Farmer*, 284 [294] Ark. 8, 740 S.W.2d 141 (1987); *Kelly [Kelley] v. Reed*, 265 Ark. 581, 580 S.W.2d 682 (1979).

16. The test is whether there was any basis for Mr. Potts' beliefs. It is the burden of one proposing to reinstate a will previously revoked to prove by the preponderance of the evidence an insane delusion. Here the petitioners fell short of their burden to prove insane delusions exist. The testimony of the forensic psychiatrist failed to meet the requirements of his own medical authority and assumed certain facts to find that Mr. Potts suffered from insane delusions.

Appellants then brought this appeal.

On appeal, we review probate cases de novo; however, we will not reverse the trial court's findings unless they are clearly erroneous. *In re Estate of Garrett*, 81 Ark. App. 212, 100 S.W.3d 72 (2003). We give due deference to the superior position of the trial court to determine the credibility of the witnesses and the weight to be accorded their testimony. *Id.*

■ Appellants do not dispute that Bill took actions that would have been sufficient to revoke his will if he had possessed testamentary capacity. Arkansas Code Annotated section 28–25–109(a)(2) (Repl. 2004) provides that a will is revoked by being burned, torn, canceled, obliterated, or destroyed, with the intent and for the purpose of revoking it by the testator. Appellants argue that Bill lacked testamentary capacity when he revoked the will and that, even if he generally had the requisite mental capacity to do so, he revoked the will as a result of insane delusions.

■ Appellants produced only a copy of the will. There is a presumption that a testator destroyed a will, executed by him in his lifetime, with the intention of revoking it, if he retained custody of it or had access to it, and if it could not be found after his death. *Remington v. Roberson*, 81 Ark. App. 36, 98 S.W.3d 44 (2003). This presumption, however, may be overcome by proof. *Id.* The proponent of the will has the burden of proving by a preponderance of the evidence that the decedent did not revoke the will during his lifetime. *Id.; accord Abdin v. Abdin*, 94 Ark. App. 12, 223 S.W.3d 60 (2006).

Appellants argue that Bill lacked testamentary capacity because he did not know the relations of those entitled to his bounty, pointing to his statements to others that he had no family. Paul testified that Bill told him that he had no family. Rene testified that Bill asked her to help him list his assets and prepare for a new will. They worked on this project for over two years, although Bill did not create a new will before he died. She said that Bill frequently told her that he had no family, which she interpreted as "no immediate family." She stated that Bill prepared a list of distant family members, but did not know if they were still alive. Don stated that, in March 2006, Bill informed him that he had no family, but also said that Bill told him that he did not want the beneficiaries of his old will, Paul and Glenville (as Wilda's surviving spouse), to inherit from him. Dr. Burton testified that Bill told him that his wife, mother, father, sister, and brother were dead.

■ Appellants bore the burden of proving that Bill lacked testamentary capacity when he revoked his will. *See Taylor v. McClintock*, 87 Ark. 243, 112 S.W. 405 (1908). Testamentary capacity is the ability of the testator to retain in memory, without prompting, the extent and condition of the property to be disposed of, to comprehend to whom he is giving, and to realize the deserts and relations to him of those whom he excludes from the will. *Id.*

It is sufficient if he has the mental capacity to understand the effect of his will as executed. *Id.* The same degree of mental capacity is necessary to revoke a will as to make one. *Hiler v. Cude,* 248 Ark. 1065, 455 S.W.2d 891 (1970). Complete sanity in a medical sense is not essential to testamentary capacity, provided power to think rationally exists. *Id.* If one has the capacity to make a will, he may make it as unjust as revenge can dictate. *Id.* With respect to the ability to know the extent and condition of the property to be disposed of and to whom it is being given, and to appreciate the deserts and relations to the testator of others against whom he discriminates or excludes from participation in his estate, that he actually has this knowledge is unnecessary. *Sullivant v. Sullivant,* 236 Ark. 95, 364 S.W.2d 665 (1963).

Thus, Bill did not need to know the actual names of each and every one of his distant relatives who might inherit from his intestate estate; he only was required to have the *capacity* to know them. As Rene said, Bill was aware that he probably had descendants from his deceased brother and sister. Bill accurately introduced Herman Potts as his cousin. Dr. Burton testified that Bill was aware that all of his immediate family members were dead, and that he did have testamentary capacity. Bill gave family heirlooms to Glenville's daughters. He impressed upon Don that he did not want the beneficiaries of his old will, specifically, Paul and Glenville, to inherit his property. Bill had no children, and he knew that his wife and every member of his family of origin were dead. He certainly knew who was listed in his old will and was adamant that they not inherit from him. Appellants failed to prove that Bill lacked testamentary capacity.

Appellants next argue that Bill lacked testamentary capacity because of three insane delusions about Paul and Glenville. Dr. Diner testified that Bill suffered from a delusional disorder, persecutory type, that caused him to irrationally believe that Wanda had sex with Glenville in 2001; that Paul had stolen a gold coin bracelet of Wanda's; and that Glenville had placed his name on Bill's bank account without permission. Dr. Diner, however, said that the alleged affair with Glenville and Paul's theft were the only delusions relevant to his opinion.

■ While an individual may possess the requisite testamentary capacity, he may, at the same time, be laboring under one or more insane delusions that may have the effect of making his purported will a nullity. *Kirkpatrick v. Union Bank of Benton,* 269 Ark. 970, 601 S.W.2d 607 (Ark.App.1980). In *Taylor v. McClintock, supra,* the supreme court described an insane delusion:

> Where one conceives something extravagant, and believes it as a fact, when in reality it has no existence, but is purely a product of the imagination, and where such belief is so persistent and permanent that the one who entertains it cannot be convinced by any evidence or argument to the contrary, such a person is possessed by an insane delusion.

87 Ark. at 277, 112 S.W. at 413.

Appellants bore the burden of proving that Bill suffered from an insane delusion when he took action to revoke his will. *See Huffman v. Dawkins,* 273 Ark. 520, 526, 622 S.W.2d 159, 162 (1981), in which the supreme court explained that such a delusion must not only exist but the will (here, the revocation) must be a product of the delusion; if there is any basis in fact for the delusion, or if it is not proven that the will (the revocation) was a product of the delusion, such a delusion will not war-

rant setting aside a legal document. The court added that the test is whether there was any basis for the decedent's beliefs, and that, where expert testimony is in conflict as to whether he suffered from insane delusions, it is the role of the probate court to resolve the conflicts. *Accord Schweitzer v. Bean,* 154 Ark. 228, 242 S.W. 63 (1922).

 The evidence clearly showed that Bill was an irascible, angry, suspicious, controlling, profane, and difficult man for most of his adult life; however, we cannot say that the trial court erred in refusing to find that he labored under insane delusions. There was some factual basis for Bill's beliefs about Paul and Glenville, even if they were wrong. In October 2001, in Bill's presence, in her kitchen in Malvern, Wanda gave a gold coin bracelet to Paul, along with a note that stated that she was giving it to him to keep and that it would be a gift to him upon her death. Bill had "wild eyes" and a "displeased demeanor" when Wanda handed the bracelet to Paul. As appellees point out, Bill's hearing problems may have prevented him from hearing what Wanda said when she gave the bracelet to Paul. Additionally, Paul did enter Bill's house after Wanda's death, when Bill was not there, while helping him maintain the house.

 There was also some evidence on which Bill could have (probably wrongly) based his conclusion that Wanda had sex with Glenville after Wilda's death. Glenville and Wanda dated before he began dating Wilda. Bill told Fred die Crownover, Rene, and Don that Wanda had admitted the affair to him. During the alleged incident, Bill stayed in the den while Wanda and Glenville went into the bedrooms so that Wanda could choose some of Wilda's clothes. Bill heard Wanda say things like "I love this." Glenville called Wanda and Bill after they returned to California; when Wanda answered the phone, Glenville heard Bill making a lot of noise in the background. Glenville asked Wanda how she stood it, and urged her to leave Bill. Glenville then heard Bill state: "That God-damn son-of-a-bitch trying to steal my wife."

Bill certainly loathed Glenville and Paul, who were aware of his temper fits. Paul tolerated him in order to remain close to Wanda. Bill made Wanda's life difficult, and she complained about him to Paul. Bill was upset about Paul's decision to have an autopsy performed after his wife died. It is, therefore, not surprising that Bill's relationship with Wanda's family was not good after she died. The long-standing acrimony between Bill and Wanda's family was more than sufficient to justify his eagerness to revoke his old will and leave nothing to appellants; therefore, appellants did not prove that, even if Bill suffered from insane delusions, they were the motivation for the revocation.

Additionally, after Wanda died, Bill managed his financial affairs with no difficulty. He enlisted Rene's help in assembling all of the information he would need to create a new will. He purchased a prepaid funeral contract from Don after thinking about it for four years. He was well-groomed, and still exercised. He made new friends. Dr. Burton, who had treated Bill for over ten years, testified that, in 2004, Bill had asked him to evaluate his mental capacity to make a new will. Dr. Burton is also a lawyer, and has extensive experience working with elderly patients. He testified that, on the basis of that exam, as well as his interactions with Bill over the years, Bill had testamentary capacity. The trial court gave more weight to his opinion than to appellant's expert, who had never met Bill. Given our stan-

dard of review, the trial court's decision must be affirmed.

Affirmed.

HENRY and BAKER, JJ., agree.